## UNITED STATES v. WHITE.

### No. 57.

Circuit Court of Appeals, Second Circuit.

Dec. 1, 1941.

182

Alan S. Hays, of New York City, for appellant.

Boris Kostelanetz, of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

White, the accused, was convicted along with four other persons and two corporations of using the mails in a scheme to defraud, § 338, Title 18, U.S.C.A. § 77(q), Title 15, U.S.C.A. and of a pendent conspiracy to commit the same crime, § 88, Title 18, U.S.C.A. The gravamen of the charge was the use of the mails for the distribution of certain prospectuses for the sale of shares of "Class A" stock in the Bankers Industrial Service, Inc., a company incorporated under another name on February 21, 1933 under the laws of Delaware. On September 20th of that year one of the accused, Gaffeney, who was convicted along with White, became president of this company, which took over what remained of the assets of another company known as Wisconsin Holding Corporation, with which Gaffeney had been associated as vice-president. New money was necessary and Gaffeney and several others of the accused decided to issue 250,000 shares of Class A common stock of the Bankers Company. On July 14, 1934 this company filed the "registration statement" required by the Securities Act of 1933 and issued a prospectus under which a small amount was sold. Later they put out three other prospectuses which were sent through the mails, and it was the financial statements in these which constituted the frauds laid in the indictment. White was a public accountant and his supposed complicity with the officers of the Bankers Company and the brokers who helped sell the stock, arose from his preparation for the last three prospectuses of these financial statements, all of which were false in a number of particulars. The first of the three prospectuses was issued on October 31, 1935, the second on August 27, 1936 and the third on December 31st of the same year. White's defense consisted in substance in saying that he took the facts which he put into the statements either from the books of the Bankers Company and of other associated companies, or from what was told him by Gaffeney, Jeffrey and others of the accused who were managing the business. The prosecution did not show that any of these men had let White know the falsity of the books or of anything they told him; but rested its case upon the inference that an accountant of White's experience and intelligence could not have let so much irregularity pass without becoming aware that it was a cover for fraud. The first point upon this appeal is therefore whether the cumulation of instances of false entries in the financial statements coupled with his explanation will support a finding of guilt. The other points are that the judge failed to tell the jury that they might bring in a verdict in favor of one of the defendants and

against the others; that he shut out the testimony of an expert accountant called by the defense; and last, certain errors in the admissions of evidence. The first point is the most important, and requires some detailed examination of the more important items out of which the prosecution built its case.

### The Claim against Wisconsin Holding Company

This item was a write-up for the year 1934 of a surplus of $8,238.78 entered in the first financial statement. This surplus was a claim due from the Wisconsin Holding Company to the Bankers Company upon its guaranty of the Bankers Company against loss on the sale of a parcel of real estate, which the Bankers Company had taken over at $29,238.78. The guaranty was that if the land should sell for less than $21,000, the Wisconsin Company would make up the difference, $8,238.78; the land was in fact sold for $18,000 and the guaranty therefore should have become due. In a letter dated June 1st in reply to a letter of White of April 12th, a girl named Stapleton who acted as an officer of the Wisconsin Company answered that there was no such contract between the companies. However, another letter of the same date was also put in evidence which mentioned the guaranty and the security which the Bankers Company held against it; but it was possible for the jury to find that the date of this letter had been changed. Finally, a letter of June 28th was also put in which corrected the statement of the security as it had appeared in the letter of June 1st. Considering the extremely shadowy nature of the Wisconsin Company's assets (as will appear later), the absence of any earlier evidence of the bargain, the necessity of showing a surplus in the financial statement, the incorrect description of the security in one letter of June 1st and the entire absence of any mention of the agreement in the other letter of that date, the entry rested upon a strangely insecure basis, and even if he had reason for believing that there was such an agreement, it is hard to suppose that White thought the account really collectible.

### Entry of Deferred Expenses in all the Financial Statements

White entered as an asset in all three of his statements outlays of the City Bank, all of whose shares were held by the Bankers Company, for salaries, telephone, stationery and other such charges. One, Hillis, an official of the bank, had refused to do this until White and Gaffeney persuaded him. White added an explanation of this item in all the statements, saying that they were for "promotion expenses", but without analyzing them. The City Bank had been organized in 1933, and it is somewhat questionable whether it ought to be credited with "promotion expenses" as late as 1936; but, that aside, a jury might have found it bad accountancy to include its "promotion expenses" as an asset of its shareholder or to consider the expenses which were in fact so described as "promotion expenses" at all.

### Accounts of the Doctors Gross

Toward the end of 1935 the Bankers Company bought for $2,000 accounts of the face value of $8,023 against the patients of two doctors named Gross. Shortly thereafter, at the instance of Gaffeney, White entered in the journal of the company an increase in value of these accounts of $5,020.12 which, together with the amount paid, amounted to 87½% of their face. In his financial statement for the year 1935, at page 14 of the prospectus of August, 1936, this write-up appeared as "Profit on purchase of accounts receivable," and on page 13 the reserve of 12½% appeared as a deduction from "Other accounts receivable purchased outright." This would have been wholly deceptive except for a note on page 16, which gave Gaffeney as authority for the statement that he had "already established the collectibility of the accounts receivable purchased outright to the exent of 87½% of their face value." Apparently accountants differ as to entering unrealized profits, and we do not say that it was fraudulent so to state them; but White was a very credulous accountant if he believed that accounts bought for only a quarter of their face really had a value of seven-eighths of it.

### Delaware Power & Light Accounts

These entries were of two kinds; the "Purchased Accounts," and the "Collection Accounts." The first were a genuine purchase for which the Bankers Company paid $20,000 to the Delaware Power & Light Company, though they succeeded in collecting only $8,500. Very shortly after

these accounts were bought the Bankers Company entered into a contract with City Bank by which it assigned them all to the bank in exchange for $22,000 of gold notes of which the State Banking Department of Delaware required the bank to get rid. This agreement was that after the bank had collected $22,000 on the accounts, all else should go to the Bankers Company. In the statement for December, 1935 White entered the accounts as an asset of the Bankers Company of a net value of $13,241.33, which figure he obtained by putting them down at $73,950.19, and setting up reserves of $60,708.86. He did not mention the agreement or any rights of City Bank, which he excused because although he had seen the agreement he did not know whether the bank had ever turned over the consideration, i.e. the gold notes. It is impossible to justify this course, for $22,000 of the accounts belonged to the bank even if it had not turned over the gold notes; the agreement would still have continued in existence and the Bankers Company could have been compelled to transfer the accounts whenever the bank chose to perform. Furthermore, White knew that the bank had been collecting some of the accounts, and further that it had credited some of the collections against other accounts. Therefore, not only was the bank acting as an owner, but it was depriving the Bankers Company of a credit, because it was entitled to all that remained after $22,000 had been collected.

The "Collection Accounts" were a mere fiction of Gaffeney. He apparently did have an agreement with Mackie, the comptroller of the Delaware Company, by which if one of its customers borrowed money of the Bankers Company, that company would deduct from the amount lent the amount of the account due and remit it to the Delaware Company, in this way becoming a kind of collection agent. White did not learn of this apparently, for he swore that Gaffeney told him that he had made an agreement with Delaware Company covering $300,000 of its accounts by which, whoever collected them, the Bankers Company should have one-third of the collections. Gaffeney did not pretend that there was any written contract to that effect, and it is difficult to see any inducement in it to Delaware Company, for apparently the Bankers Company was not to advance any money or even do all the collecting, though perhaps that is to

be implied. Again, it required a credulous accountant to accept such a story.

Using these two contracts—"Purchased Accounts" and the apocryphal "Collection Accounts"—as his excuse, White made two entries as of June 30, 1936 in the journal of the Bankers Company, crediting it with $12,120. This he explained by saying that Gaffeney had estimated that on the "Purchased Accounts" the company's one-third would amount to $4,120, and on the "Collection Accounts" to $8,000. He supplemented these entries on December 31, 1936, by another entry of $5,500, estimated apparently only on the "Collection Accounts." These two figures made up an item of $17,620 which he put into the financial statement as of December 31, 1936, under the heading "Collection fees due from vendors of accounts receivable on estimated collections received and retained by them." Once more his excuse was that he believed Gaffeney; but, at least as to the "Collection Accounts," a positive bit of evidence contradicted him. On March 12, 1936 he wrote to the Delaware Company, asking as of December 31, 1935 for any accounts between itself and the Bankers Company. The fourth of his inquiries was: "Any agreement between you in addition to the agreement under which certain accounts receivable aggregating $80,708.86 were sold by you to them?"; and the fifth was: "Any transactions between you not specifically requested above?" On April 10, 1936 Mackie answered both these questions. "None." White appears to have realized that this did not quite match with Gaffeney's story, and he swore that he asked Gaffeney about it, but was content to be put off with what should have been the very unsatisfactory explanation that he was not to press the inquiry further because it might antagonize the Delaware Company.

Notes receivable on December 31, 1936

In his statement as of December 31, 1936, White stated that the Bankers Company held $114,645.13 notes receivable. Nearly $70,000 of these were not signed until the spring of 1937, over $30,000 were notes of officers or employees of the company, and nearly $30,000 were over one year old and no collections had been made on them. He set up no reserve for any of them, nor did he add any comment to show that they were not all received in due course of business. This was extremely misleading when one

remembers that the natural understanding of such an entry was that these were notes of small borrowers, such as the company's business would naturally produce.

### Claims against the Wisconsin Holding Company and the Brandywine Bulletin

The books of the Bankers Company showed claims against the Wisconsin Holding Company for services rendered. Thus, there was an entry as of December 31, 1935 of $9,485, and on June 30, 1936 another entry of $3,765.20. Again, for the six months ending December 31, 1936 there was an entry of $9,500. Assuming that there could have been any services actually rendered to this company, it is hard to see how White could have thought the accounts of any value; for at that time it had no other asset than the shares of the Bankers Company. Had White known this, obviously it would not have been honest to put in the claim without some notation. He swore that he did not know what were its assets, but, as usual, that he relied upon Gaffeney. But he did know that at most it could only have been the mere shell of a company, managed in the office of the Bankers Company, and he also knew that the confirmations of the account, when he asked for them, came from the girl Stapleton; and that when at his demand book accounts were changed into negotiable notes, it was she who signed them.

He also put among the assets in the statement of December 31, 1936 eight notes aggregating $8,053.60 of the Brandywine Bulletin, one given for services rendered and the others for loans. The Bulletin published a magazine in the office of the Bankers Company, which had no subscribers and was gratuitously distributed, though it did carry advertisements, from which we may assume that it had some income. However, Gaffeney had bought it for $150 in December, 1935, Stapleton was apparently in charge of it, and it was highly improbable that it could respond for so substantial an amount.

### The Gaffeney Interim Account and Promotion Expenses

Gaffeney repeatedly took money out of the Bankers Company in most irregular ways and never accounted for any of it. White entered these withdrawals as capital expenses, his explanation being that he trusted what Gaffeney said about it. Perhaps so, but it was a very irregular method of business, and offered a convenient way to cover up these thefts which were actually taking place.

It is true that all these instances, taken singly, do not prove beyond question that White knew that the statements which he prepared were padded with false entries; but logically the sum is often greater that the aggregate of the parts, and the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force immensely greater than any one of them alone. White, upon his own showing, was being continually asked to put into his statements items which the jury might have found were not good accounting, and was continually accepting statements of Gaffeney which were on their face suspicious. We do not say that his guilt was demonstrated, but enough was proved to subject him to the hazard of a verdict; faced with the choice of finding him a knave or a fool, we cannot say that the jury was bound to acquit him; fair men might have had no compunction in refusing to believe that he was so credulous or so ill acquainted with his calling as a finding of innocence demanded.

The judge's charge as to the jury's power to bring in separate verdicts was adequate; he told them that their "verdict * * * should be as to each defendant separately and as to each of the nineteen counts. Your verdict should be guilty or not guilty as you may find." How they could have failed to understand that they might find "each defendant separately" guilty or not guilty we cannot understand.

The judge's exclusion of the opinion of an expert accountant called by the defense to meet the testimony of Hynan, the prosecution's expert, is more serious. Hynan had said that in making up the financial statements White used poor accounting methods, or had made up his own statements in other ways, which came to the same thing. Obviously, answering testimony was vital to the defense; the denials of the accused are at best a feeble reed and the only effective answer which could here be made was the testimony of a fellow accountant. Nevertheless, as the matter came up, we think that White was not deprived of any substantial right. After the accountant had been qualified as

an expert he was asked whether, based on what he had heard of White's testimony in court, and upon his examination of the financial statements, they had been "set up according to recognized accounting principles." The judge sustained an objection to this, at first because the question was "wholly immaterial." If he had adhered to that position we should have had no choice but to reverse the conviction; but he did not do so. When White's counsel said that he understood that "one of the issues * * * is whether or not Mr. White followed accounting principles" the judge at once assented, but added that the question had not been well framed, and that if the counsel wished to put a hypothetical question he might do so "stating what facts that you think have been established." After further colloquy he added: "You may put a hypothetical question, if you can frame one that is proper." The counsel answered that he could not do this and concluded that he would address himself to "specific matters." He then put two questions asking the witness's opinion as to whether it was proper for an accountant to write up books which had not been posted to date; and the judge again declared that that inquiry was "not relevant," in which again he was wrong. The counsel then made a third effort by asking whether it was proper for an accountant to rely upon statements of the officers of a company whose financial statement he was preparing. This time the judge declared that he would allow the question if it incorporated "the testimony that you think has been established," and later suggested that the witness be withdrawn and that a proper "hypothetical question" be framed. The counsel declared that he would "like to follow that helpful advice," and after some further irrelevant talk withdrew the witness. That was on Wednesday and although the evidence was not closed until Friday, White's counsel made no effort to prepare the hypothetical question.

From all this it appears that the judge meant no more than to insist upon the conventional form of hypothetical question into which is incorporated by way of preamble all the evidence on which the opinion is formed. It is of course necessary that at some stage and in some way it shall appear that the witness is basing his opinion only upon evidence in the case, but the conventional form, however right in logic, is the worst way to accomplish that result; it is a custom more honored in the breach than in the observance, and its "abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice." Wigmore § 676. There was no reason why any of the questions in the case at bar should have been excluded; it was far more convenient to take the answers and leave to cross-examination the detection of anything not in the evidence on which the witness had relied. Indeed it is impossible in the case of the last two questions to see how they could have been helped by any preamble; they were complete in themselves. Nevertheless, the rulings did no more than impose a needlessly cumbersome burden upon the defense; they did not deprive it of any substantial right.

■■ Finally, the accused complains of four instances in which proper questions were ruled out, and of one instance when the judge made an unfair comment. The last rests upon a misapprehension of what he said; he was merely explaining the testimony of Hynan, the prosecution's witness. As to the questions, although all four should have been allowed, it would be absurd to treat the errors as ground for reversal. No judge in so extended a trial can avoid on occasion rulings that on reflection he will see to have been wrong; but, unless they cut off some really substantial aspect of the truth, or let in too distracting issues, they are not important. And in this connection we wish to suggest that the disposition to rule out evidence because it offends against some canon of the law of evidence is to be discouraged; admission seldom does any harm, while exclusion often proves extremely embarrassing in sustaining a judgment fundamentally just.

Judgment affirmed.