Grace E. PERKINS, Administratrix of the Estate of Roy W. Perkins, Plaintiff-Appellant,

v.

UNITED TRANSPORTATION COMPANY and Taddeo Forte, Defendants-Appellees.

No. 75, Docket 23170.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1954.

Decided Jan. 24, 1955.

See, also, 14 F.R.D. 152.

Washton & Vogt, New London, Conn. (A. A. Washton, New London, Conn., of counsel), for plaintiff-appellant.

Philip R. Shiff, New Haven, Conn., for defendants-appellees.

Before CLARK, Chief Judge, and MEDINA and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

Roy W. Perkins, a youth of 19, was killed on July 21, 1952, in an automobile accident involving a collision between a panel truck driven by Perkins and a tractor-trailer truck owned by United Transportation Company and driven by its employee, Taddeo Forte.

The accident took place about 10 P.M. at the intersection of Route 84 (on which the United truck was proceeding in a westerly direction) and Old Route 84 (on which Perkins was driving in a southeasterly direction) in the town of Groton, Conn. Except for the two drivers there were no eyewitnesses to the accident.

Perkins' mother as Administratrix of his estate sued United and Forte for negligence, the suit being tried in the United States District Court for Connecticut which had jurisdiction because of diversity of citizenship and the amount involved. This appeal by the Administratrix is from a judgment of dismissal entered upon a verdict of a jury in favor of the defendants.

The sole ground of appeal is that the trial Court, over the objection of the plaintiff, admitted testimony from three police officers—none of whom, except for one who surveyed the scene of the collision, had any direct knowledge of this accident—that Perkins had the reputation of being a bad driver. This testimony was admitted on the issue of damages, Judge Smith instructing the jury when the testimony was going in and thrice in his charge that the jury was not to consider it as having any bearing on the question of who was at fault in the accident.

■■ The admissibility of this evidence is to be judged by the most lenient of the following rules: (1) any rule prescribed by United States statute, (2) the rule followed by Connecticut courts of general jurisdiction, (3) the rule applied in suits in equity in United States courts before the adoption of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 43(a), 28 U.S.C.A. No United States statute governs this situation. And we find nothing to indicate that the other two possible rules give a different result. Connecticut appears to follow the general rule governing the admissibility of this type of evidence in this sort of case. That rule simply is that where, as in Connecticut, damages for wrongful death include lost earnings, the determination of the decedent's earning capacity shall be made "with due allowance for the effect which the ordinary vicissitudes of life might have had upon his continued enjoyment of those capacities * * *", Chase v. Fitzgerald, 1946, 132 Conn. 461, 45 A.2d 789, 793, 163 A.L.R. 247; hence any evidence which reasonably bears upon the probability of the decedent, had he lived, engaging in gainful work or upon the likely extent of his earning power is admissible on the issue of the amount of recoverable damages. This includes evidence of reputation, for whether the decedent had a good or bad reputation in his trade or calling would in some instances bear upon his earning power and therefore, in a proper case, such evidence is relevant on the issue of lost earnings. Wigmore, Evidence § 75 (3rd Ed. 1940). Jacques v. Bridgeport Horse R. Co., 1874, 41 Conn. 61. But in an action of this character such evidence is not admissible on the issue of fault, as Judge Smith properly ruled. This appears to be the law of Connecticut. See Gannon v. Sisk, 1921, 95 Conn. 639, 643, 112 A. 697. And no federal case has been presented to us which indicates that another rule prevailed in equity suits in the federal courts before the adoption of the Federal Rules of Civil Procedure.

■ While there is no absolute rule excluding reputation evidence on the issue of damages in a negligence case, neither is there any absolute rule admitting it for such purpose. As with many kinds of evidence, the admissibility of this sort of evidence must turn on the facts of the

particular case. And in this instance we think the evidence was inadmissible because in the circumstances of this case (1) it had no real probative value on the issue of the decedent's loss of earning power and (2) to the extent the evidence might be said rationally to bear on that issue its value was so far eclipsed by the risk that the jury might consider the evidence on the issue of fault as to require its total exclusion.

Jacques v. Bridgeport Horse Railroad Co., supra—the only Connecticut case which has been called to our attention involving this question—illustrates the type of situation in which such evidence is admissible. There a physician sued a railroad company for injuries arising out of the negligent maintenance of its tracks and it was held permissible for the defendant to show that the plaintiff was engaged in the unlawful practice of medicine and that he had that reputation, the Court stating, 41 Conn. 67: "As the plaintiff sought to recover damages on account of being disabled from practicing his profession, his reputation, as to the lawfulness or unlawfulness of his practice, became a proper subject of inquiry. The value of that practice must have depended very largely on that reputation. If his practice was unlawful, no matter how lucrative it might have been, the loss of it would lay no foundation for the recovery of damages. The questions put to the plaintiff, and also to the other witnesses, may not have been the best mode which could have been adopted for reaching the truth; still we think the questions should not have been excluded. The plaintiff's claim, in effect, put his professional reputation in issue and made these questions proper. The answers to them would tend to throw light upon the subject which the defendants had a right, under the circumstances, to investigate".

While it is not altogether clear whether the Connecticut court would have regarded the reputation testimony as being admissible, apart from the alleged illegality of the plaintiff's practice, we shall accept its holding as going that far. Even on that basis the case is far removed from the present one. In Jacques the plaintiff's claim for lost earnings concerned his inability to carry on a *particular* profession in which he was already established, and one in which his earning power was intimately related to his reputation in his calling. In the present case this element of damages concerned the decedent's loss of *general* earning power, since it cannot be assumed that a youth of 19 will necessarily continue to earn his living by truck driving. In particular there was evidence that the decedent had not worked steadily as a truck driver, that he had served honorably in the Navy, and that he was interested in agriculture and animal husbandry—in neither of which pursuits, if later resumed or engaged in, could it reasonably be expected that the decedent's reputation as a driver of motor vehicles would affect his earning power. Moreover, if we are to assume that the decedent would eventually have established himself as a truck driver, it is difficult to see how his youthful reputation in this respect might be expected to affect his ability to earn as little as $40 a week—the order of his past earnings in such employment. In such a setting we think this evidence had no tendency towards proving anything as to the decedent's loss of earnings.

But even if we were to regard the evidence as of some probative value, it was much too slight in the circumstances of this case to justify its admission against the danger—recognized by Judge Smith in his memorandum denying the plaintiff's motion for a new trial, 14 F.R.D. 152,—that the jury would be influenced by the evidence, even though unconsciously, in determining where the fault of the accident lay. The only testimony from an eyewitness to the accident was that of Forte, the driver of United's truck. While that testimony has not been transcribed as part of the trial minutes, and so is not available to us, in the nature of things it is apparent that the issue of fault was in any event a close one. Forte, as an employee of United and as a defendant himself, was

an interested witness. And the only other testimony as to the issue of fault was that of a police officer who gave circumstantial evidence as to the accident, consisting of a description of what he found upon arrival at the scene, from which different inferences were permissible. Further, it should be observed that this reputation testimony, unlike that in the Jacques case, related to the very type of activity that was a prime issue in this case—the decedent's skill and prudence in operating his truck on the night of the accident. In this posture of affairs the danger that the decedent's reputation for bad driving might be regarded by the jury as tipping the scales in favor of the defendants on the issue of fault was such that the evidence should have been excluded.

■ Although we have treated all of this testimony as going to the decedent's "reputation" as a driver of motor vehicles, there is at least grave doubt whether that of Officers Dupont and Larizzo may properly be so characterized. Objections to much of their testimony were properly sustained because it related merely to the witness' observations of the decedent's driving on other specific occasions, rather than to his general reputation for driving,[1] and although Judge Smith conscientiously tried to keep the testimony within the bounds of reputation evidence, much of what was permitted to stand was objectionable, or at least on the borderline, from the same standpoint.[2] The over-all effect of this testimony, remembering that the excluded questions and

1. Objections to the following questions and answers were sustained:

Police Officer Dupont:

"Q. Now, Officer, will you tell the ladies and gentlemen of the Jury what you have observed about Mr. Roy Perkins? A. Well, on June the 3rd, 1952 at 11:05 a. m. in the morning I observed Roy Wallace Perkins driving at a very fast rate of speed— * * *

"Q. Now, Officer, would you be good enough to tell the ladies and gentlemen of the Jury what you have observed about Mr. Perkins' driving habits? A. On June 3, 1952, 11:05 a. m. I observed Roy Wallace Perkins driving at a fast rate of speed in a 25 mile per hour zone. Upon stopping him I smelled alcoholic liquor on his breath. Ten or twelve days after, or two weeks after, as a police officer I worked night clubs in the City of New London, and Roy Perkins came into a night club which is the Victory Restaurant on Bank Street, and knowing the boy's age I ordered him out of there because no minors are allowed in there. Now, on July 4, 1952 at 3:30 p. m. I arrested—

"Mr. Washton: I object to that Your Honor.

"The Court: Sustained.

"Q. You see, Officer, all I want you to tell us is what opinion you formed from your observation of him as to his character, his character as a driver of a motor vehicle. A. As a driver of a motor vehicle he drove pretty recklessly. * * *

"Q. Based upon your own observations and your discussions with others in regard to Roy Perkins what is your opinion as to his reputation as a driver of a motor vehicle? A. As a driver of a motor vehicle he drove awful recklessly."

2. The following testimony was permitted to stand:

Police Officer Dupont:

"Q. Officer Dupont, were you acquainted with Roy W. Perkins? A. Yes.

"Q. Prior to July 21, 1952? A. Yes, sir.

"Q. For how long a period of time have you known him? A. The first acquaintance I had with him was June, the 3rd. I have some memos here from the records of the New London Department. * * *

"Q. I want you to confine your testimony to your knowledge of him and his reputation as a driver of a motor vehicle. A. He was a very reckless driver. * *

"Q. Are you acquainted with his reputation as a driver in the community in New London? A. I am.

"Q. And what is your acquaintance? What is your opinion of his reputation as a driver based upon, Officer? A. My observation of him.

"Q. And have you talked with other officers with reference to him? A. Yes. * * *

"A. I have the motor vehicle record. * * *

"A. (continuing) Yes, I have spoken to other officers. We had his number and his registration number in the Police Station. * * *

"Q. In the community in which you observed his operation as a motor vehicle operator what is your testimony as to

answers took place in the presence of the jury, added up to very little more than that these two police officers had seen the decedent driving too fast on a number of prior occasions and that he had a police record for bad driving. Consequently, even if reputation testimony were admissible here on the issue of fault, the testimony of these two officers might well be regarded as coming within the Connecticut rule excluding similar conduct on other occasions as evidence of the character of the particular conduct in issue. See Ross v. City of Stamford, 1914, 88 Conn. 260, 91 A. 201; Black v. Hunt, 1921, 96 Conn. 663, 115 A. 429.

█ On the record before us we cannot regard the error in admitting the testimony of the three police officers as harmless, nor treat it as cured by the Court's instructions that the jury should not consider the testimony on the question of liability. In so holding, we impute to the jury no lack of intelligence or conscientiousness in attempting to follow the instructions of the Court, nor do we apply a more rigorous standard than has Connecticut. In Jacques, supra, the Connecticut Supreme Court of Errors reversed a finding of negligence partly on the ground that evidence of other similar acts of negligence by the defendant

has been improperly admitted, even though the case had been tried to the court without a jury, and even though such evidence had been stricken at the end of the case and the court had expressly disclaimed giving it any heed in reaching its decision.

We conclude that the appellant Administratrix is entitled to a new trial, untrammelled by this inadmissible evidence.

Reversed for a new trial.

CLARK, Chief Judge (dissenting).

This, I fear, is another instance of a seemingly hard case making bad law. I say "seemingly," as on the surface this appeared to be a situation where a mother was denied recovery for the death of her son because of an atmosphere created at the trial raising doubts as to the son's general driving habits. For the parties in a rather natural attempt to limit the papers on appeal—now unnecessary under our new rule for appeal on the original papers—gave us little more than the evidence rulings objected to below.[1] But an examination of the trial court records gives the case a different aspect, showing, as it does, a very thorough five-day trial with extensive testimony, among which was a two-day examination and cross-examination of the individual de-

his reputation? A. He was a fast driver, a reckless driver. * * *

"Q. Between June 3 of '52 and July 21 of '52 how many different times did you observe him? A. I observed him four different times that I have had conversation with him.

"Q. You had conversation with him on those particular occasions? A. Four different occasions.

"Q. And those conversations related to his driving? A. They were related to his driving.

"Q. The other one was with reference to what? A. To the night club."

Police Officer Larizzo:

"Q. And when prior to July 21, 1952 did you first make his [Perkins'] acquaintance? * * *

"Q. Would you be good enough to answer the question? A. Yes, sir. My first contact with Roy Perkins was either in the latter part of '51 or early part of '52. I can't recall the exact date. I was

sent on a complaint to his home— * * *

"Q. Did you have occasion to observe him in his conduct as an operator of a motor vehicle on the highway of the State? A. I did, sir. * * *

"Q. And in addition to your own observations have you had occasion to talk with other police officers with reference to Roy W. Perkins? * * *

"Q. Have you? A. Yes, sir, I have.

"Q. And based upon your own observations and what you have learned concerning his reputation will you state to the members of the Jury and to His Honor what your knowledge is of his reputation as a driver? A. He was a poor driver."

1. The parties last June entered into a stipulation as to the contents of the record on appeal—which was then printed; but this was hardly intended to, nor could it, exclude other details below from our consideration. See our present Rule 11(b) and F.R. 75(h).

fendant. And while not all the testimony was transcribed, enough was available to make clear the demonstration made to the jury below, from the very real evidence of the tire marks on the highway and the damaged portions of the colliding vehicles, that Perkins had driven through a stop sign onto the through highway upon which defendant Forte was driving his truck and ahead of Forte, and that the only reasonable ground for recovery was a last clear chance. But further, the severe damage to the left front of Perkins' vehicle and the right front of Forte's suggests difficulty in ascribing a last chance to Forte to avoid the collision. Hence I do not believe the case can be considered a close one. I advert to these facts not as settling the question of evidence here involved, but as eliminating the otherwise moving humanitarian basis for reversal. I have long been one of those who have been convinced that the problem of award for automobile accident victims was not met at all adequately by application of doctrines of common-law negligence.[2] But until this law is changed by the proper authorities I feel that we must accept it, and should not warp or distort our rules of evidence in an obviously vain attempt to ameliorate its harshness.

The logical basis for the trial court's rulings seems soundly buttressed in state law, as well as in the general law of evidence. In Chase v. Fitzgerald, 132 Conn. 461, 45 A.2d 789, 792, 163 A.L.R. 247, it was held that the measure of damages in wrongful death actions was compensation for destruction of earning capacity, and that earning capacity could be shown by past wages and by "general experience as a wage earner and * * * qualifications for conducting a gainful occupation." See also McManus v. Jarvis, 128 Conn. 707, 22 A.2d 857; Federman v. City of Stamford, 118 Conn. 427, 172 A. 853; Hayes v. Morris & Co., 98 Conn. 603, 119 A. 901; Jacques v. Bridgeport Horse R. Co., 41 Conn. 61, 19 Am.Rep. 483; and Comstock v. Connecticut R. & Lighting Co., 77 Conn. 65, 58 A. 465, 466, where Judge Simeon E. Baldwin said that the decedent's "general qualities and his qualifications for any particular business in which he may be engaged may be described by those who know him * * *." Thus there is no doubt that under Connecticut law the challenged testimony was of some relevance. See also 1 Wigmore on Evidence § 75 (3d Ed.1940).[3] Once this premise is established, Connecticut law is furthermore clear that the possible remoteness of the evidence was a question peculiarly within the province of the trial judge. Saporiti v. Austin A. Chambers Co., 134 Conn. 476, 58 A.2d 387; State v. Isaacson, 114 Conn. 567, 159 A. 483; Ruerat v. Stevens, 113 Conn. 333, 155 A. 219.[4]

I can agree with essentially all my brethren have said in suggesting the rather weak character of this evidence as it appeared when the case had been closed, though not necessarily when it was proffered. But what they say lends emphasis to the point that I am making, since it is so decidedly directed to the weight, rather than the rational character, of the

---

2. See Report by the Committee to Study Compensation for Automobile Accidents to the Columbia University Council for Research in the Social Sciences (Feb. 1, 1932), in which I participated; and see also Grad, Recent Developments in Automobile Accident Compensation, 50 Col.L. Rev. 300 (1950); James & Law, Compensation for Auto Accident Victims: A Story of Too Little and Too Late, 26 Conn.B.J. 70 (1952).

3. Holding further that "where injury to earning capacity is involved, the actual character may be material, and conceivably also the reputed character for skill and the like," thus making inappropriate the criticisms of the detailed and subordinate rulings as in note 2, supra. Cases such as Black v. Hunt, 96 Conn. 663, 115 A. 429, and Ross v. City of Stamford, 88 Conn. 260, 91 A. 201, concern the issue of negligence, not that of earning capacity.

4. In view of this principle it seems unfortunate that Judge Smith's careful and balanced approach to his decision on the plaintiff's motion for a new trial should be somehow taken as an admission against interest on his part.

evidence. But weight is typically a matter to be tested by the trier of facts and is not a ground in itself for finding irrelevance. This ruling suggests interesting questions as to how far appellate eclecticism should go. Since doubt is suggested as to the weight here, with respect to a boy 19 years old getting $40 a week, we are left to conclude that greater age and greater wages would lend a support to Judge Smith's ruling that it does not now have. Thus, would the evidence be admissible if it concerned a man 40 years of age earning $60 a week? Just where is the line of adequate weight met and passed? And—since I doubt that the state courts will wish to follow this ruling—how are Judge Smith and Judge Anderson going to decide or to know how to decide the next case of this general type they get? It may almost be thought that the more bite the evidence has, the less admissible may it eventually prove.

Such pertinent questions are particularly indicated when appellate interference means an upsetting for restoration and long retrial in a crowded docket of a case apparently well tried by an experienced trial judge. So by way of summary I suggest that this ruling, however humanitarian it may appear, seems to me to violate three principles of proper approach to appellate supervision of trial activities. First, it reverses the usual attitude expressly demanded by F. R.C.P., rule 43(a), and indeed often reiterated by us by way of advice to trial judges of the general trend toward admissibility of all relevant evidence and the resolution of doubts that way. See, e. g., United States v. White, 2 Cir., 124 F.2d 181, 186; Dundom v. New York Cent. R. Co., 2 Cir., 145 F.2d 711, 713; Reck v. Pacific-Atlantic S. S. Co., 2 Cir., 180 F.2d 866, 869–870, and cases there cited. Second, it interferes with the informed control of the case by the trial judge upon whom responsibility for proper conduct of the case must impinge much more than upon any appellate judge. And third, despite my brothers' disclaimer, it does reflect upon the highly intelligent juries so customary in this district. Of course I appreciate a current attitude to view the jury as a necessary palladium of our liberties, while never trusting it to exercise any common sense or even intelligence. But I see no reason to conclude that the jury here either did not or could not understand or perhaps willfully violated Judge Smith's clear-cut and often reiterated admonitions as to the necessary and proper limits on the use of this testimony.

Let me reiterate that it is not the loss of the one minor item of evidence to which I take exception; it is rather the whole approach to the important question of jury trials in our congested modern metropolitan courts. Had the judge excluded the evidence, I think we could have upheld his hand as a proper discretion against collateral voyages. But after most extensive consideration he acted otherwise. And now we send the case back for a week's retrial for the express purpose of putting blinders on the triers.