UNITED STATES of America, Appellee,

v.

Martin BENJAMIN, Bernard Howard and Milton Z. Mende, Defendants-Appellants.

No. 192, Docket 28404.

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1963.

Decided Feb. 17, 1964.

**856**

Menahem Stim, New York City (Curran, Mahoney, Felix & Stim, New York City) (Allen S. Stim, John F. Kelly, New York City, of Counsel), for appellant Bernard Howard.

Arthur Addess (Bobick & Deutsch, New York City) for appellant Milton Z. Mende.

Irwin L. Germaise, New York City, for appellant Martin Benjamin.

Neal J. Hurwitz, New York City (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, John S. Martin, Jr., Asst. U. S. Atty., of Counsel), for the United States of America.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

■ This appeal concerns another of those sickening financial frauds which so sadly memorialize the rapacity of the perpetrators and the gullibility, and perhaps also the cupidity, of the victims. It is unusual in that the vehicle, American Equities Corporation, owned nothing at all—and, in a happier sense, in that the SEC was able to nip the fraud quite early in the bud. The appellants are Milton Mende, the principal promoter, Martin Benjamin, his lawyer, and Bernard Howard, a certified public accountant. After trial in the District Court for the Southern District of New York before Judge Palmieri without a jury, all three were convicted of conspiring willfully by use of interstate commerce to sell unregistered securities and to defraud in the sale of securities, in violation of the Securities Act of 1933, §§ 5 (a) and (c), and 17(a), 15 U.S.C. §§ 77e (a) and (c), and 77q(a), sections which are implemented criminally by § 24 of the Act, 15 U.S.C. § 77x. Mende and Benjamin were convicted also on three substantive counts for using the mails in furtherance of the fraudulent schemes, in violation of 18 U.S.C. § 1341. As their sentences on the latter counts were the same as those on the conspiracy count and run concurrently with them, and as we are satisfied that their conspiracy conviction was proper, we need not concern ourselves with the mail fraud counts. Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958).

Since the principal claim of Howard and Benjamin relates to the sufficiency of the evidence against them, it is necessary to give some description of what went on. The scheme began in December, 1960, when Mende, then in Nevada, arranged to be put in touch with a Reno attorney, McDonald, who was reported to

have some "old corporations prior to 1933" for sale. Mende's interest in corporations of such vintage was due to § 3(a) (1) of the Securities Act of 1933, 15 U.S.C. § 77c(a) (1), which confers an exemption from the need for registration on

> "Any security which, prior to or within sixty days after May 27, 1933, has been sold or disposed of by the issuer or bona fide offered to the public, but this exemption shall not apply to any new offering of any such security by an issuer or underwriter subsequent to such sixty days."

He was especially attracted by a 1919 shell, then bearing the rather appropriate name of Star Midas Mining Co., Inc. Authorized to issue 1,500,000 shares with a par value of 10¢ per share, Star Midas had approximately 964,000 shares outstanding, nearly all owned by a so-called "Mahoney group." It had no assets. After arranging to purchase the Mahoney holdings for $5,000 plus a $1,-500 fee, Mende instructed McDonald to change the corporate name to American Equities Corporation and to increase the authorized capital to $1,500,000 by raising the par value to $1 per share. Before closing the purchase, the funds for which were not yet available, Mende, with McDonald's cooperation, bought stock certificates and a seal reflecting these changes. The purchase was not completed until February 23, 1961, when McDonald, having previously caused appropriate resolutions to be adopted and new officers and directors of Mende's selection to be named, turned over to Reiss and Kovaleski, as Mende's representatives, the books and records of the corporation and stock certificates for the 890,000 shares owned by the selling group. At this time the name of the corporation was changed.

Mende had not waited to acquire the American Equities shares before starting to sell them. In mid-January, 1961, he ordered an additional supply of stock certificates from a Los Angeles printer. By entering a bid to buy shares he arranged for American Equities to appear in the pink and white sheets of the National Quotation Service at a price of something over $5 per share. Robert Drattell, president of Lawrence Securities, Inc., which was inactive because of financial difficulties, testified that Benjamin then sought to interest him in selling shares of a corporation whose alleged assets corresponded with those later shown in statements of American Equities. Benjamin indicated that if Drattell would cooperate, he might be in a position to find some way to make capital available to Lawrence Securities. Later in January, Benjamin had Drattell come to a New York hotel to meet Mende, who told Drattell and Reiter, another broker, in Benjamin's presence, that American Equities "was a holding corporation that had property, various types of property all over the United States, assets of about six and a half million dollars, liabilities of about three million dollars." Mende whetted Drattell's appetite, as Benjamin had already done, by indicating he would help to get Lawrence Securities back on its feet. Drattell said he "would need letters of opinion" and "certified financial statements," and also would need to see the transfer records which, Mende told him, were kept by "a certified public accountant out on the Coast."

Benjamin speedily filled one of Drattell's demands by handing him a signed opinion, dated January 28, 1961, headed "To Whom It May Concern: American Equities Corporation." It recited that the corporation was organized in May, 1919, "and there was at that time issued to the public, 963,067 Shares." It went on to say that in Benjamin's opinion "the aforesaid shares are presently free and tradeable pursuant to" § 3(a) (1) of the Securities Act which it quoted, and reiterated:

> "In view of the foregoing section, and further in view of the fact that the original issuance of the 963,067 Shares in May of 1919, falls directly within Section 3(1) of the Securities Act of 1933, and is therefore, in my opinion, free and tradeable." [sic]

858

On January 28, Benjamin with Reiter and another broker, Parks, went to Los Angeles. Mende gave 4,000 shares of American Equities to Parks and 20,000 shares to Reiter, and also handed Reiter 5,000 shares to be given to Drattell. The latter used these to obtain from the Empire Trust Company a $12,500 loan, $3,500 of which went to bolstering Lawrence Securities' depleted capital account and the balance to Reiter, Mende and Mende's wife; Drattell sent a confirmation, dated January 31, 1961, of the "purchase" of these 5,000 shares for $9,000 to "Martin Benjamin Trustee." Later, after Drattell had gone to California to view some of the supposed assets of American Equities, he and Benjamin visited the office of Reiss, the transfer agent, where Benjamin prepared two letters. One, signed by Reiss, advised as to the 5,000 shares given to Drattell "that said certificates is free stock and is not investment stock";[1] the second, dated back to January 31, and signed by "Martin Benjamin Trustee," purported to evidence the "sale" of the 5,000 shares for $9,000 and directed the distribution to Reiter and Mrs. Mende that had already been made.

Reiter and Parks had also brought from California copies of a paper with a printed cover entitled "American Equities Corporation." This contained an unidentified "Pro Forma Balance Sheet" as of November 30, 1960, in fact prepared by Reiss,[2] and a sheet of descriptive material, a draft of which the judge could reasonably have found to have been written out by Benjamin. The first numbered paragraph of this recited that American Equities was "a diversified investment company formed in the State of Nevada in 1919" and that its holdings consisted of "8 Apartment Houses, 2 Hotels, 2 Office Buildings (all located in Detroit area, Michigan)" with a "gross income from the properties" of $1,061,406.51 and net income of $200,000. This was completely false; the company

owned no real estate in Detroit or elsewhere. Three subsequent paragraphs gave facts and figures as to the Outpost Inn, in Arizona, Biesmeyer Boat & Plastic Co., also of Arizona, and Stanford Trailer and Marine Supply Co., of California; the description did not say just what was American Equities' interest in these companies and the only elucidation in the balance sheet was in a note indicating that the price of the Outpost Inn would be $71,000 in cash and a $79,000 note, the former being separately shown as a liability. In fact, no arrangements of any kind had been made as to the Outpost Inn, and the owner of Biesmeyer testified that in December, 1960, he had agreed to give Mende an option for a down payment of $10,000 which was never made; we are not informed as to Stanford Trailer and Marine. Finally the description stated that American Equities "has acquired a working interest of 68% of the California Molded Products," whose 1961 sales were estimated at $2,000,000 with a gross profit margin "in excess of 30.1% with a potential of 32% by April, 1961," and that American Equities was negotiating to acquire still other companies, one "doing in excess of $20,000,000.00 annually." In fact, and to Benjamin's knowledge, American Equities had not acquired any interest in California Molded Products; all it had was a month's option, dated January 16, 1961, to acquire 68% of the stock for $145,000.

In mid-January, Benjamin invited Howard, a certified public accountant who had served Benjamin and his clients, to do some work for American Equities. Howard testified he received the November 30, 1960, "Pro Forma Balance Sheet," a yellow handwritten sheet of paper listing certain real estate holdings in Detroit, and balance sheets of corporations which Mende and Benjamin claimed were "owned or controlled" by American Equities. From these materials and without any examination of books and

---

1. By what Drattell assumed to have been a Freudian slip, the word "not" was originally typed "hot."

2. Reiss was also convicted of conspiracy but has not prosecuted an appeal.

records, he prepared a paper dated February 10, 1961, and on the following day gave copies of this to Mende who handed one to Reiter. The latter testified that this was in Howard's presence.

The paper has a cover, on the stationery of Howard as a Certified Public Accountant, which bears the legend:

AMERICAN EQUITIES CORPORATION

DECEMBER 31, 1960

AUDITORS REPORT

This is followed by a two-page letter in which Howard advises the company that "After an examination of the books and records of the diversified holdings of your corporation for the period ended December 31, 1960," he is submitting a report of the company as at that date, consisting of "Exhibit 'A'—Pro-forma Balance Sheet as at December 31, 1960." Next comes a section entitled "COMMENTS" informing the company that it is "a diversified investment corporation with the following holdings." These were substantially the same as in the description accompanying the November 30 statement, with the Outpost Inn, Biesmeyer, Stanford and also California Molded Products now clearly listed among them. The comment on California Molded Products anticipates 1961 sales of $2,000,000 with gross profit margin in excess of 30% and a net of better than 4%, but omits to limit the company's interest in these riches to 68%, the most that was claimed by the November 30 balance sheet. The comments say that "The statement which is pro-forma includes the disposition of $500,000 which a group of stockholders propose to advance to the corporation as a long term loan"; that $150,000 of this was to be advanced to subsidiaries for working capital and $71,000 "to repay an officer for the purchase of the assets of the Outpost Inn, Inc."; that "The assets are shown at actual cost and are calculated at the most conservative value," although "A recent appraisal of the real estate in Detroit shows an increase of approximately $2,500,000.00

over book value, which has not been reflected in the statement"; that "The accounts receivable, loans receivable, loans payable, and mortgages payable were not verified by direct communication" and inventories were taken as submitted by the management; and, finally, that "The statement reflects an accurate and true picture of the corporation's net worth after taking into consideration the proposed loan by the officers." The "Pro-Forma Balance Sheet as at December 31, 1960" showed total assets of $7,769,-657.11 and a net worth of $3,681,049.70 —this including $963,067.00 in the capital stock account. Howard received $200 for his two days of service in preparing the report.

During February, Mende asked Howard to investigate a possible acquisition, on which Howard made a negative recommendation, and Howard discussed the statements of Plametron Corporation with its owner, Frankl, who had previously offered a half interest for $150,000 and was desirous of selling to Mende. In Howard's presence Mende gave Frankl a copy of Howard's December 31 Auditor's Report. There was evidence also that Drattell, whom Howard knew to be a broker interested in American Equities stock, telephoned him to discuss this report. Toward the end of February Mende asked Howard to come out to California; Mende's promise of a $200 advance remained unfulfilled despite Howard's repeated requests but Mende gave him a one-way air ticket. He stayed with Benjamin from February 27 to March 7 at the Beverly Hilton Hotel, which cut off food and telephone service for non-payment of bills and threatened to hold his baggage on departure. While in California, he made some examination of the books and records of California Molded Products, without investigating whether American Equities in fact owned 68% of the stock, and also of J. S. Lane & Co. which Mende said he was interested in buying for American Equities. Howard was given a copy of a statement, dated August 31, 1958, of Verdi Development Corporation; Ko-

valeski told him this was a dormant corporation which had been through a Chapter X proceeding and whose principal asset, a uranium mill, had been sold in foreclosure.

Under date of March 6, 1961, after the cut-off of food and telephone service, Howard rendered a second "Auditor's Report," which he left with Benjamin. This purportedly reflected "an examination of the books and records of the diversified holdings of your corporation for the period ended January 31, 1961." Although generally similar to his previous "Auditor's Report," it differed in some significant respects: Biesmeyer Boat and Plastic Co. and Stanford Trailer and Marine Supply Co. were no longer included; as Howard was later to tell the grand jury, the two boat companies "went down the river." Nevertheless the list grew from five to six through three additions. Plametron Corporation was included, without any investigation of its acquisition on Howard's part despite the personal knowledge he had gained. So also was J. S. Lane & Co.; Mende and Benjamin had been negotiating for the purchase of this company for $1,100,000 as Howard well knew since only a few days previously he had examined its books "to determine if the price they were offering was adequate * * *." As seems generally to have been the case, Howard's pro-forma report apparently makes no provision as to the acquisition cost. The comments also note the inclusion in the balance sheet of "Verdi Development Company * * * a mining company with various mills and claims in California, Utah and Nevada"; despite the age of Verdi's financial statement and what Kovaleski had told him, Howard reported as an asset "Unrecovered Development Costs" of $707,554.21, this being a major factor in the remarkable increase in American Equities' net worth from $3,681,049.70 to $4,609,560.-07 in a single month. In addition to the $2,500,000 increment in the Detroit real estate from an appraisal previously reported, there is now an added $500,000 increase in the value of equipment. Nowhere was it suggested, unless by the naked word "pro-forma," that American Equities' acquisition of the mentioned companies had not yet been accomplished. To the contrary, a new paragraph recited:

"A consolidated statement of income and profit and loss for the six months ended January 31, 1961 shows a net profit $399,623.94 on the basis of the last six months operations of the six corporations involved although they were all only recently acquired within the last few months. However, on the basis of a yearly projection of the six profits the corporation shows a net earnings of approximately 80¢ a share. With the contemplated expansion program under way, this should be increased."

This was supported by an exhibit entitled

AMERICAN EQUITIES CORPORATION

CONSOLIDATED STATEMENT OF INCOME AND PROFIT AND LOSS FOR THE SIX MONTHS ENDED JANUARY 31, 1961.

American Equities stock continued to be sold until March 22, 1961, when, as a result of the SEC's action, trading stopped.

■■■ Howard's principal claim is that the evidence against him was insufficient to show the state of mind required for a criminal conviction. He says he was performing an accountant's duties innocently if inefficiently—and for a negligible compensation, that he sheltered himself with the label "proforma," and that he did not know his reports were to help in stock peddling but thought they were to be used solely for management purposes. His own testimony belies the last claim; he admitted knowing that the promoters intended to use the stock as collateral for loans or as part of or collateral for the purchase price in various acquisitions and that his statements were shown to prospective lenders or sellers. Since his reports were little more than a regurgitation of material handed him by the "management" and related to properties that, as

he had reason to know, were not owned, the judge could properly have regarded his claim that he thought them needed for "management" purposes as incredible in the last degree. But the evidence we have summarized shows directly that he knew his reports were being used with brokers who were selling the stock. Drattell, whom he knew to be a broker interested in American Equities, telephoned him in regard to his reports,[3] and, on Reiter's testimony, he saw Mende hand a copy of his first report to Reiter whom he knew to be similarly interested.

■ The argument that reports which depicted American Equities as owner of properties and companies it neither owned nor had any firm arrangements to acquire were not false because they were stated to be "pro forma" involves a complete misconception of the duties of an accountant in issuing a report thus entitled. Although pro forma statements "purport to give effect to transactions actually consummated or expected to be consummated at a date subsequent to that of the date of the statements," "auditors consider it proper to submit their report and opinion on such statements only when the nature of the transactions effected is clearly described in the statements, and when satisfactory

evidence of their bona fides is available, such as actual subsequent consummation or signed firm contracts." Montgomery, Auditing Theory and Practice (6th ed. 1940), 62–63; see also Prentice-Hall Encyclopedic Dictionary of Business Finance (1960), 485. It would be insulting an honorable profession to suppose that a certified public accountant may take the representations of a corporation official as to companies it proposes to acquire, combine their balance sheets without any investigation as to the arrangements for their acquisition or suitable provision reflecting payment of the purchase price, and justify the meaningless result simply by an appliqué of two Latin words.

■■ It is true that the Government had not merely to show that the statements were false but to present evidence from which the judge could be convinced beyond reasonable doubt of Howard's culpable state of mind. But, as Judge Hough said for this court years ago, "when that state of mind is a knowledge of false statements, while there is no allowable inference of knowledge from the mere fact of falsity, there are many cases where from the actor's special situation and continuity of conduct an inference that he *did* know the untruth

3. *Howard objected to the admission of* this evidence on the ground that Drattell, who had not previously met him, could not identify his voice. It is true that the mere announcement of identity *by a person who has placed a telephone call* does not suffice to make it admissible against the person so identified. See 7 Wigmore, Evidence 617 (3d ed. 1940), and United States v. Ross, 321 F.2d 61, 69 (2 Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). But Wigmore rightly differentiates the case "of B's *first calling up* A and being *answered by a person purporting to be A.*" In Van Riper v. United States, 13 F.2d 961, 968 (2 Cir.), cert. denied sub nom. Ackerson v. United States, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926), Judge Learned Hand approved decisions "that when a witness calls up at the proper number in a telephone book the person whose admissions are relevant, and gets an answer from one professing to be the person called, it is prima facie

proof of identity." See also United States v. Rosenberg, 195 F.2d 583, 597 (2 Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L. Ed. 652 (1952); United States v. Bucur, 194 F.2d 297, 303–304 (7 Cir. 1952). The evidence here went far beyond what Judge Hand thought should suffice as "prima facie proof of identity." Drattell called the number given in Howard's December, 1960, report, was answered by a man identifying himself as "Bernard Howard," discussed the report with the answering voice, was given another number which Howard admits to be his, called that number, was answered by the same voice which again discussed American Equities and was later called by the same voice for a further discussion. To say that all this did not establish Howard's identity sufficiently to make the conversation admissible would outrage common sense.

of what he said or wrote may legitimately be drawn." Bentel v. United States, 13 F.2d 327, 329 (2 Cir.), cert. denied sub nom., Amos v. United States, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926). Any accountant must know that his obligations in certifying "pro forma" statements are not satisfied by any such arithmetical exercise as Howard performed. But, as our description of the reports has indicated, there were further false assertions, some of them clearly known to Howard to be such; these constituted a basis for holding him that was independent of the falsity of the total report, as well as for discrediting his assertions of ignorance as to what was required of him. The Michigan real estate was represented to Howard not as properties to be acquired but as already owned; he claimed to have seen deeds for these properties but admitted that American Equities was not named as grantee. The statements that certain assets had not been "verified by direct communication" implied that with this qualification all assets had been verified by suitable means; they had not been. Howard made no examination of American Equities' books, which, indeed, were not available when he rendered his first report; even a most cursory inspection would have revealed that nothing had been paid when the capital stock account was written up ten-fold. His statement purported to reflect "an accurate and true picture of the corporation's net worth after taking into consideration the proposed loan by the officers"; at best it would have been accurate only if the corporation had had at least some contractual basis for the assertion of ownership, and even then only if proper provision had been made for the cost. The inclusion as an asset of over $700,000 of "Unrecovered Development Costs" of a dormant mining company known to have been through insolvency proceedings was wholly indefensible. Perhaps most damning of all was the making of a profit and loss statement including a positive assertion that the six companies were "acquired within the last few months," when Howard knew that at least some of them had not been acquired at all.

■ These and other items we could mention—and this in a setting where, at the very time that Howard was delivering his second report extolling the prospects of this $8,700,000 company, he had been unable to obtain a $200 advance and the hotel had turned off food and telephone service for nonpayment of bills —were quite sufficient to convince a trier of the facts beyond a reasonable doubt that Howard had actual knowledge of the falsity of his reports and deliberately conspired to defraud investors. As Judge Learned Hand said in a similar context, " * * * the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force immensely greater than any one of them alone." United States v. White, 124 F.2d 181, 185 (2 Cir. 1941).

■ In fact, however, the Government was not required to go that far. "Willful," the Supreme Court has told us, "is a word of many meanings, its construction often being influenced by its context." Spies v. United States, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943), citing United States v. Murdock, 290 U.S. 389, 394–396, 54 S.Ct. 223 78 L.Ed. 381 (1933). We think that in the context of § 24 of the Securities Act as applied to § 17(a), the Government can meet its burden by proving that a defendant deliberately closed his eyes to facts he had a duty to see, compare Spurr v. United States, 174 U.S. 728, 19 S.Ct. 812, 43 L.Ed. 1150 (1899) and American Law Institute, Model Penal Code, § 2.02(7), commentary in Tent. Draft No. 4, pages 129–30 (1955), or recklessly stated as facts things of which he was ignorant. Judge Hough so ruled in Bentel v. United States, supra; although that case and the similar ruling in Slakoff v. United States, 8 F.2d 9 (3 Cir. 1925), were under the mail fraud statute, § 215 of the then Criminal Code, 35 Stat. 1130 (1909), the ancestor of 18 U.S.C. § 1341, which does not use the

term "willfully," the Congress that passed the Securities Act scarcely meant to make life easier for defrauders. Other circuits have gone further and have held the willfulness requirement of the Securities Act to be satisfied in fraud cases by proof of representations which due diligence would have shown to be untrue. Stone v. United States, 113 F. 2d 70, 75 (6 Cir. 1940); United States v. Schaefer, 299 F.2d 625, 629, 632 (7 Cir.), cert. denied, 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962). In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar. Of course, Congress did not mean that any mistake of law or misstatement of fact should subject an attorney or an accountant to criminal liability simply because more skillful practitioners would not have made them. But Congress equally could not have intended that men holding themselves out as members of these ancient professions should be able to escape criminal liability on a plea of ignorance when they have shut their eyes to what was plainly to be seen or have represented a knowledge they knew they did not possess. Compare Brown v. Bullock, 294 F.2d 415, 420 (2 Cir. 1961), as to the meaning of willful conversion in § 37 of the Investment Company Act, 15 U.S.C. § 80a–36.

Much of what we have said as to Howard is relevant also to Benjamin's claim of insufficiency of the evidence as to his culpable state of mind. Benjamin brought Howard into the scheme; he had written out the list of assets which Howard later used in his first report; as Howard testified, Benjamin had told him to take the statements of the various companies "and just put them into a consolidated form"; and his work in connection with several of the proposed "acquisitions" gave him actual knowledge of the falsity both of the November 30 statement and of Howard's reports. But there was much more than this. His opinion letter made a positive statement that he believed all the shares of American Equities were exempt from registration, although he must have known that control of the corporation, not yet even named "American Equities Corporation," was being acquired by Mende and that the statute explicitly denied exemption to any new offerings by persons in control, a limitation of which his testimony before the SEC showed he was well aware. Yet there is abundant evidence that Benjamin knew Mende was putting American Equities shares on the market. Among the instances was the transaction outlined above with Drattell in late January wherein Benjamin received a confirmation of a purchase of 5,000 shares from "Martin Benjamin Trustee" for $9,000—at a time when the pink sheets were quoting the stock at $5 per share or more—and the distribution of part of the proceeds to Mende and his wife; yet Benjamin prepared a letter whereby the transfer agent certified these shares to be "free stock and * * not investment stock." In another transaction, not previously mentioned, wherein Mende had a nominee, Mrs. Tanner, sell American Equities shares to relatives and friends of Paul Reicher, her father, on a basis whereby she retained $2 per share for her pains, she received a letter signed by "Martin Benjamin Trustee" acknowledging the sale of 11,000 shares to her and the receipt of $4.75 per share. Benjamin's role was far more than that of an attorney. He told Drattell he was acting as a "trustee" for some of the principals and, when Drattell sought elucidation, explained that "as a trustee and as an attorney * * * licensed in the State of New York, * * * he was not obligated to reveal any of the sources and it is enough for anyone to accept a legal document from a trustee who was an attorney and the trustee was not required to reveal the source of the legal document or who the principals were behind the legal document"—surely a novel contribution to the law of trusts. His proffer of financial aid if Drattell would undertake some distribution of American Equities afforded further basis for inferring knowl-

edge of the intended fraud, as did his efforts falsely to minimize Mende's role when he and others were examined by the SEC. This and other evidence made a case at least as strong as that held sufficient with respect to another lawyer in United States v. Crosby, 294 F.2d 928, 938 (2 Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

Howard and Benjamin make the complaint, standard in appeals of this sort and buttressed by the inevitable citation of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that although the indictment alleged a single conspiracy, the proof showed separate ones to sell unregistered securities and to defraud. The argument could not avail Benjamin in any event since the evidence clearly implicated him in both aspects of the scheme. See United States v. Agueci, 310 F.2d 817, 827–828 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963). But the point is wholly without merit. The fraudulent acts and the unlawful failure to register information which would uncover them were essential steps in a single scheme to dupe; the limited scope of Kotteakos was explained in Blumenthal v. United States, 332 U.S. 539, 558–559, 68 S.Ct. 248, 92 L.Ed. 154 (1947) and its inapplicability to an integrated financial fraud like this was affirmed by us in United States v. Crosby, supra, 294 F.2d at 944–945. It is thus immaterial that the evidence may not have shown awareness by Howard of the part of the scheme that involved the sale of unregistered shares, United States v. Agueci, supra, and cases there cited.

Mende, as the central figure in the scheme, has not challenged the sufficiency of the evidence introduced against him. He raises several points on appeal; all seem so patently without substance as not to require discussion. We here mention only his claim that McDonald's testimony should have been excluded under the attorney-client privilege, and we do that solely to state its complete lack of merit. The relation between Mende and McDonald was not that of client and attorney but of buyer and seller; what Mende was seeking from McDonald was not legal advice but a pre-1933 corporate shell.

Affirmed.