UNITED STATES v. MONJAR et al.
No. 88.

District Court, D. Delaware.
Oct. 6, 1942.

Stewart Lynch, U. S. Atty., of Wilmington, Del., for the Government.

Daniel O. Hastings (of Hastings, Stockly & Layton), of Wilmington, Del., for defendants.

LEAHY, District Judge.

Defendants have demurred to the indictment, which contains 25 counts. Counts 1 to 15 and 23 to 24 charge violations of the mail fraud statute, 18 U.S.C.A. § 338. Counts 16 to 22 charge violations of the fraud provisions of the Securities Act, 15 U.S.C.A. § 77q. Count 25 charges conspiracy to violate both statutes, 18 U.S.C.A. § 88.

The grounds of demurrer are divided into two groups. The first challenges the sufficiency of the mail fraud and Securities Act counts on the ground that the indictment fails to allege a scheme to defraud and false or otherwise unlawful pretenses. By the second group, defendants contend that even if such scheme and pretenses are alleged the government has still failed to charge defendants with any unlawful violation of the Securities Act.

1. Sufficiency of Allegations of Scheme to Defraud and Unlawful Pretenses.

The determination of this issue calls for close scrutiny of the allegations of Count 1 of the indictment. All the remaining counts incorporate Count 1 by reference.

In 1928 defendants organized an unincorporated association called the "Mantle Club." In 1933, deciding to make the membership in the club nation-wide, they set up subordinate lodges or districts,[1] each of which was at first subject to the control of a local Board of Governors. Later, the constitution of the Club was amended to provide for a National Board of Governors, consisting of three persons whose terms of office were for life, the successor of any deceased governor being designated by the survivors, ad infinitum. The original three member National Board consisted of defendants Monjar, Cook and Jones. Presently ten members comprise the Board.

In 1933, defendants organized the Key Publishing Company, a New York corporation, to publish a magazine known as the "American Key." This publication was financed by contributions from members of the Mantle Club. Monjar was made editor of the magazine, at a salary of from $500 to $1,500 a month. Jones became president of Key Publishing Company and Cook, its treasurer, each receiving $500 per month salary. The magazine was sold at 25¢ a copy, almost exclusively to the members of the club. Defendants also published two books written by Monjar—"The Code of Ethics" and "Supplement to the Code of Ethics." These were sold to the members of the club at $2.00 a copy, of which Monjar first received an author's royalty of $1.00, and later of 25¢.

After the nation-wide campaign for members had been successfully completed, a representative of the National Board of Governors visited each of the cities in which a district had been set up and selected from the files of the district those members who had "proved they could be trusted and that they were loyal" to defendant Monjar. An officer of the local unit then notified the selected members to attend a special meeting. There, the representative of the National Board of Governors announced that they were not attending a meeting of the Mantle Club, but that, inasmuch as they were gathered together, it would do no harm to discuss the affairs of the club. The speaker would then give a vivid and fictional history of the former activities of defendant Monjar, after which those present were asked to make so-called "PL" loans to Monjar, each member's loan to be limited to a minimum of $30 and a maximum of $200. The loans were to be made in ten equal monthly installments.

The representatives, in addressing the various meetings, made the following false representations:

1. Monjar received no compensation from the Mantle Club.

2. Monjar required money for his living expenses.

3. The loans had nothing to do with the Mantle Club.

---

[1] Local districts were organized in Oakland, Los Angeles and San Francisco, California; Portland, Oregon; Seattle, Washington; Denver, Colorado; Cleveland, Ohio; Baltimore, Maryland; Pittsburgh and Philadelphia, Pennsylvania.

4. Monjar would put the money received to good use in furthering the affairs of the Mantle Club, and he would organize business enterprises which would operate for the benefit of the persons making the loans, assuring their eventual financial independence.

The indictment charges that the representatives of the National Board of Governors wilfully omitted to inform the persons making the loans that: (1) Monjar was not and would not be financially able to repay the loans; (2) He intended to use part of the loans to settle large claims for unpaid taxes;[2] (3) He intended to use part of the loans to effect a property settlement on a former wife, and to pay large sums to his present spouse, defendant Josephine T. Monjar; and (4) He intended to use part of the loans to organize other corporations which would be used to obtain fraudulently still further funds from other members of the Mantle Club.

After a number of the "PL's" had been obtained from the members, defendants set up a new system of loans to be known as the "CD" loans. In the solicitation of these loans the following false representations were made:

1. The financial independence of those who had previously made the "PL" loans was assured.

2. Solicitation of the "PL" loans was finished.

3. Persons invited to attend the "CD" loan meetings were to be subjected to a further test.

4. As the financial independence of those attending the "CD" meetings had been assured through their "PL's", they would be given an opportunity, by means of making "CD" loans, to provide for the same financial independence of members of the Mantle Club who resided elsewhere.

Monjar gave no receipt to the member-lenders, for either group of loans, but his local representatives gave receipts signed by themselves as agents. The local representatives periodically transmitted in the mails bank drafts for the proceeds of the loans and various reports showing the amount of each loan made, together with a list of those who did not make loans. The members have been solicited annually since 1934.

Part of the money received from the loans was used to organize and finance several other companies. One of these was the "Golden Braid Costume Company", which was to manufacture and sell to the Mantle Club 50,000 uniforms at $15 each. The National Board of Governors required the local districts to purchase numbers of such uniforms far in excess of the numbers of members qualified to wear them. The Golden Braid Costume Company paid large salaries and dividends to defendant Mrs. Monjar and to other relatives of Monjar.

Other corporations formed were the American Business Management Corporation, the American Business Research Corporation, the American Distributing Corporation and the Independence Club of America. Defendants controlled these organizations and caused them to enter into contracts among themselves for the purpose of giving them an appearance of business activity. Actually, they performed no services and were mere instrumentalities to siphon additional money into the pockets of defendants.

After the "PL" and "CD" loans were made, the defendants and their agents represented to the persons who had made the loans that Monjar had developed plans to make the lenders financially independent but that the plans had not been put into operation because of high income taxes and the present world situation. They assured them, however, that the plans would be in operation in a short time. All this, the indictment charges, was false.

█ To be secure from attack by demurrer the indictment must describe the scheme to defraud and other elements of the offense with sufficient particularity to enable defendants properly to prepare their defense, Leche v. United States, 5 Cir., 118 F.2d 246, certiorari denied 314 U.S. 617, 62 S.Ct. 73, 86 L.Ed. 496; Hart v. United States, 5 Cir., 112 F.2d 128, and after judgment to plead a conviction or acquittal in bar to a second prosecution for the same offense. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; United States v. Empire Hat & Cap Manufacturing Co., et al., D.C., 47 F.Supp. 395. I believe this indictment passes the test by setting out in detail the scheme to be relied on and the false representations.

█ Defendants in support of the demurrer analyze each paragraph of the in-

---

[2] For a recent opinion on Monjar's tax difficulties see Monjar v. Higgins, D.C., 45 F. Supp. 303.

dictment which describes the scheme and make comment such as "This is not fraudulent" or "This is not, in itself, a fraudulent act." It is not necessary that each paragraph of a count describe an offense. If the allegations as a whole describe the scheme to defraud, the requirements of criminal pleading are met. United States v. White, 2 Cir., 124 F.2d 181.

Defendants in discussing certain of the false promises alleged in the indictment, argue "if the promise is made in good faith when the contract is entered into, there is no fraud." There is no dispute as to this rule of law. Amer.Jur., Vol. 13, pp. 887, 888. But it is a matter of defense and need not be negatived in the indictment. Moreover, after describing the false representations, the indictment states that defendants "then and there well knew" that the representations were false. Cochran v. United States, 8 Cir. 41 F.2d 193; Hass v. United States, 8 Cir., 93 F.2d 427.

In further support of their demurrer, defendants argue that the allegations of the indictment are "illogical." In fact, the scheme here alleged might be denominated as "fantastic"; but this is no ground for demurrer. While it is difficult to believe that the victims could have accepted and acted upon the alleged statements of defendants, this astounding credulity does not relieve the wrongdoers. Tucker v. United States, 6 Cir., 224 F. 833, certiorari denied 241 U.S. 668, 36 S.Ct. 552, 60 L.Ed. 1229. It may be that the averred scheme would not have deceived a person of ordinary intelligence, but the statutes here involved were enacted for the very purpose of protecting those who lack business acumen. The need for such statutes is that "* * * the credulity of mankind remains, yet unmeasured." O'Hara v. United States, 6 Cir., 129 F. 551, 555. I conclude this ground of demurrer is without merit.

The first count, however, does not allege that the mailing of the letter referred to therein was "for the purpose of executing said scheme and artifice to defraud and for the purpose of obtaining money and property by means of false and fraudulent pretenses, representations and promises and attempting so to do * * *." It is therefore not sufficient, and I sustain the demurrer as to it. In fact, the government concedes that the defect in Count 1 exists. However, the government may still utilize Count 1 as a "reference" count, so that the remaining counts of the indictment can incorporate the scheme set out in Count 1. Touhy v. United States, 8 Cir., 88 F.2d 930; Bell v. United States, 5 Cir., 100 F. 2d 474.

## 2. The Securities Act Counts.

Counts 16 to 22 charge violations of Section 17(a) (1) of the Securities Act of 1933, as amended.[3] Defendants first contend that the indictment must expressly allege the transmittal of either a security or a prospectus of a security via the mails or by some means of interstate commerce. The act has not been so construed. Coplin v. United States, 9 Cir., 88 F.2d 652 (use of telephone to solicit the purchase of a security without transmittal of the security) and Kopald-Quinn & Co. et al. v. United States, 5 Cir., 101 F.2d 628, certiorari denied Ricebaum v. United States, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (mailing of a confirmation and not the security). The target at which the act aims is the scheme to defraud. True, use of the mails or the facilities of interstate commerce is the basis of federal jurisdiction. But it is not an element of the offense that a particular sale be shown. In Landay v. United States, 6 Cir., 108 F.2d 698, the mails were used simply to acknowledge receipt of an order to purchase and a check received in payment for the security. In Pace v. United States, 5 Cir., 94 F.2d 591, the mailings were letters expressing thanks for orders for stock given to defendants' salesmen.

Again, defendants argue that the counts are so vague that they do not sufficiently inform defendants of the charge that they must meet at trial. These counts plead the words of the statute and recite the simple story of loans made by persons who were falsely told they would have financial independence. Defendants' asserted inability to understand what the indictment charges is, I believe, more feigned than real. "* * * The strict technicality and rigor of the old common law rules are presently superseded by liberality in the construction of indictments in order that specific justice may not be defeated by subservience to technicalities." U. S. v. Em-

3 15 U.S.C.A. § 77q: "It shall be unlawful for any person in the sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly— (1) to employ any device, scheme, or artifice to defraud."

426

pire Hat and Cap Manufacturing Co., D.C., 47 F.Supp. 395.

It is obvious to the court that, as contended by the government, the only real question is whether the "PL" and "CD" loans constituted the sale of securities as the terms "sale" and "security" are defined in Section 2(1) and 2(3) of the Securities Act of 1933.[4]

 The progenitors of the Securities Act were the Blue Sky Laws, which consistently received a broad interpretation in order to eradicate the evil they were intended to cover.[5] In defining "sale" and "security", the courts have consistently striven to give them a most liberal construction.[6] In Securities and Exchange Commission v. Crude Oil Corporation of America, 7 Cir., 93 F.2d 844, 847, the court, aware that the Blue Sky Laws had been subject to many attempts at evasion and that Congress obviously had this in mind when enacting the Securities Act of 1933, said: "The legislation in question followed the enactment of what has generally been called the Blue Sky Laws of the various states, and the ingenuity and fertility of resources of those dealers in securities who deliberately attempted to avoid their application supplied the background of experience against which this legislation was written." Hence, upon examination, it is clear that the definitions of "security" and "sale" in the Securities Act of 1933 is even broader than those in many of the State Blue Sky Laws.

In one of the early cases arising under the Securities Act of 1933, Securities and Exchange Commission v. Wickham, D.C., 12 F. Supp. 245, 247,[7] we find the court stating: "In determining whether or not a transaction involves the issuance of a security, the courts have repeatedly announced that it will look to the substance and not the form of the transaction."[8] A recent case involved the utilization of the newer devices somewhat comparable to those used by the defendants in the case at bar. In Securities and Exchange Commission v. Universal Service Association, 7 Cir., 106 F.2d 232, 235, a voluntary association was formed known as the "Universal Order of Plenocrats." The form of application for enrollment contained representations that in "plenocracy" contributions of money are coordinated with labor and land with the resultant "science of creating abundance for all." It further represented that 30% of the endowment would be set aside annually for distribution among the Plenocrats. In holding that the scheme entailed the "sale" of a "security" rather than "a voluntary donation to a charitable use", the

[4] 15 U.S.C.A. § 77b:

"(1) The term 'security' means any note stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

\* \* \* \* \*

"(3) The term 'sale', 'sell', 'offer to sell', or 'offer for sale' shall include every contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value; \* \* \*."

[5] State v. Whiteaker, 118 Or. 656, 247 P. 1077, 1079: "We do not deem it advisable to lay down any hard and fast rule \* \* \*. Were we to do so, a certain class of gentlemen of the 'J. Rufus Wallingford' type—'they toil not neither do they spin'—would lie awake nights endeavoring to conceive some devious and shadowy way of evading the law. It is more advisable to deal with each case as it arises." See, also, State v. Gopher Tire & Rubber Co., 146 Minn. 52, 177 N.W. 937; State v. Evans, 154 Minn. 95, 191 N.W. 425, 27 A.L.R. 1165; Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904, 54 A.L.R. 495; State v. Robbins, 185 Minn. 202, 240 N.W. 456; Stevens v. Liberty Packing Co., 111 N.J.Eq. 61, 161 A. 193.

[6] 26 Virginia Law Rev. 807–814; annotation, 87 A.L.R. 42, at page 74; 38 Words and Phrases, Perm. Ed., pp. 468–487; 34 Mich.Law Rev. 1135; 48 Yale Law Journal 149.

[7] The case is discussed as demonstrating a tendency to avoid limitations of scope of the Securities Act in 36 Col.Law Rev. 683.

[8] Cases announcing such a principle are: Securities and Exchange Commission v. Tung Corporation of America, D. C., 32 F.Supp. 371; Securities and Exchange Commission v. Pyne, D.C., 33 F. Supp. 988; Securities and Exchange Commission v. Payne, D.C., 35 F.Supp. 873; and Securities and Exchange Commission v. Bailey, D.C., 41 F.Supp. 647.

427

court said: "The various application instruments are in form consistent with defendants' contention. But decisions uniformly hold that in determining whether a particular instrument is a security within the meaning of the act the substance of the transaction and of the relationship between the alleged issuer and alleged security holder will control as against the form of the alleged security. * * * One of the recognized purposes of the Securities Act is to compel full disclosure of the truth, and the form of arrangements or transactions whether they be styled sales of commodities, agencies, leases, applications, endowments, or by any other name must be tested by the rule of substance. It is true that when Congress attaches consequences to form, such as the precise wording of an instrument, or the corporate device for tax purposes, the courts may not regard substance as controlling. But in this case we are controlled by an act of Congress which is intended to prevent overreaching and to mandate 'fair disclosure'; and the Congressional expressions relating to 'securities' are so broad and all-inclusive that we must recognize that the Congressional intention is to give effect to substance and not to form."

Defendants argue, however, that all of the cases discussed are suits under the remedial—not the penal—provisions of the act, so that those courts were free to adopt a liberal construction of the statute. Since we are here dealing with criminal provisions of the statute, they argue, a strict construction must be applied.[9]

■■■ In the light of the decisions, this rule cannot be denied. However, its application to the present case does not alter the result. The transactions in this case clearly come within the statutory definition[10] without resort to liberal in contradistinction to strict construction.

Each person making a loan received a receipt signed by the person accepting the loan as "agent" and making reference to "H.B.M.—PL" or "H.B.M.—Personal Loan." The receipts were the only evidence that defendant Monjar had borrowed money. Those dissatisfied with the arrangement were to be allowed a refund of the amount advanced as shown by the receipts. To this extent, the receipts certainly fall within the category of an "evidence of indebtedness" as that term is used in Section 2(1) of the Statute. Again, the indictment charges that the money received from the loans would be used "to organize business concerns which would operate for the benefit of the persons making the loans." The money was paid over by the members who made the "PL" and "CD" loans with the expectation that the return to be obtained would give to "worthy men" financial independence. Under such an arrangement, the receipts issued to those making the loans likewise come within the definition of an "investment contract."

■■■ I conclude that counts 16 to 22 sufficiently allege violations of Section 17 (a) (1) of the Securities Act of 1933 in that they allege a scheme to defraud in the sale of "securities" and the use of instruments of transportation or communication in interstate commerce, or the use of the mails.

■■■ One further ground in support of the demurrer remains. The indictment does not allege the transmission from or receipt in this district of a prospectus or security. This is a deficiency, defendants contend, which deprives the court of jurisdiction under Section 20(b) of the Act.[11] This argument postulates the presence of a security or prospectus in every violative act. The readily demonstrable falsity of this postulate explodes the argument. Section 5 (a), 15 U.S.C.A. § 77e(a), makes it unlawful to use the mails or interstate commerce to sell unregistered securities through the use of a prospectus "or otherwise." It is clear there could be a violation of this section without transmitting either a security or prospectus. Again, Section 23, 15 U.S.C. A. § 77w makes it unlawful to represent that the Commission has approved a security; no transmittal of a prospectus or security is necessary to violate this section. Similarly, Section 24, 15 U.S.C.A. § 77x, prohibits the making of a false statement in

9 Prussian v. United States, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610; United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127; Fasulo v. United States, 272 U.S. 620, 47 S.Ct. 200, 71 L. Ed. 443; United States v. Lacher, 134 U.S. 624, 10 S.Ct. 625, 33 L.Ed. 1080; United States v. Chase, 135 U.S. 255, 10 S.Ct. 756, 34 L.Ed. 117.

10 15 U.S.C.A. § 77b(1) at footnote 4, supra.

11 15 U.S.C.A. § 77t(b): "Any such criminal proceeding may be brought either in the district wherein the transmittal of the prospectus or security complained of begins, or in the district wherein such prospectus or security is received."

428

a registration file. Certainly the violation of this section does not depend upon the transmittal of the prospectus or security.

It was not the intention of Congress that Section 20(b) fix venue for all violations of the act. It merely provides for an auxiliary venue under certain circumstances; and district courts are not divested of their general jurisdiction under 28 U.S.C.A. § 103. Kopald-Quinn & Co. et al. v. United States, 5 Cir., 101 F.2d 628.

### Count 25.

This count charges defendants with conspiracy to violate the Mail Fraud and Securities Acts in violation of Section 88 of Title 18, U.S.C.A. As I have already found that the allegations are sufficient for the substantive offenses, it follows that the allegations looking to a conspiracy are sufficient.

Let an order overruling the demurrer, except as to Count 1, be submitted.