**W. Howard CLAY, Appellant,**

v.

**MT. HOLLY DEVELOPMENT COMPANY, Inc., et al., Appellees.**

Court of Appeals of Kentucky.

March 12, 1971.

W. Howard Clay, Louisville, for appellant.

Fred M. Goldberg, Louisville, for appellees.

PALMORE, Judge.

W. Howard Clay appeals from a summary judgment requiring him to pay Mt. Holly Nursing Home, Inc., the sum of $7,807.59 and, in effect, dismissing his counterclaim for $69,499. The judgment was entered on the basis of the pleadings, answers to interrogatories, and Clay's deposition taken by the adverse parties.

The suit was brought by two corporations against Clay as one of their officers for the recovery of funds allegedly converted to his own use without authority. The counterclaim asserted a claim for services rendered and a claim for breach of contract. We are of the opinion that the counterclaim for services should proceed to trial, for which reason the judgment must be reversed.

The essential facts are as follows:

Clay, Wilson and Carrier formed two corporations to acquire land and to construct and operate on it a nursing home. Clay and Wilson were and are lawyers. Carrier had money. Clay found and optioned the property. Wilson brought Clay and Carrier together, and Carrier put up the money to buy the property, which was taken in the name of one of the corporations and in return for which that corporation gave Carrier its promissory note. Later on this corporation sold a portion of the property to the other corporation, the appellee Mt. Holly Nursing Home, Inc., (hereinafter Mt. Holly) which thereupon proceeded to build and operate a nursing home and, as between the two corporations, is the main contestant with Clay.

Each of the two corporations issued shares of stock divided 70% to Carrier and 15% each to Clay and Wilson. Neither Clay nor Wilson put up any cash or other assets. Clay says his stock was in the nature of a finder's fee. Wilson's, presumably, was issued in payment for his assistance in putting the deal together. At all times relevant to this discussion these three men constituted all of the officers, directors and stockholders of the corporations. There was an initial corporate meeting on November 20, 1962, at which bylaws were adopted, an executive committee was constituted, and officers were designated. Carrier was president and Clay was made executive vice-president, secretary-treasurer, and chairman of the executive committee.

The executive committee consisted of Carrier, Clay and Wilson. Clay's official authority was established by resolution as follows:

"WHEREAS W. Howard Clay is First Vice-President, Secretary and Treasurer and Chairman of the Executive Committee of the Mount Holly Nursing Home and said W. Howard Clay is negotiating and acting as Attorney for the building of a nursing home on the afore- [sic] said four (4) acres of land to be purchased from Mount Holly Development Company; that said W. Howard Clay be granted full authority to negotiate with the Federal Housing Administration and the mortgagee, Greater Louisville, First Federal Savings & Loan Association and authorized to execute all necessary papers, Mortgage, and other closing documents as necessary and/or required by either the Mortgagee or the Federal Housing Administration or any applicable laws of the state of Kentucky for the Mount Holly Nursing Home, Inc."

After the organizational meeting in November of 1962 and until some time in 1964 the venture was carried forward in an informal manner insofar as corporate records are concerned. The three men met from time to time, but the ball was carried almost entirely by Clay, and he was assiduous in reporting to, seeking the advice of, and keeping Carrier and Wilson informed by way of telephone conversations and by frequent letters and memoranda. These writings, copies of which were introduced with Clay's deposition, prove beyond cavil that he devoted a great deal of time, skill and effort in consummating the object of the venture. Some $470,000 was borrowed through an FHA loan and was used to construct the nursing home. Other funds were borrowed to equip and furnish it. Employees were hired and steps were taken to advertise the home and secure customers for it. The multitudinous details incident to all of this were handled by Clay, as was the supervision of the operation after it opened for business in March of 1964.

Beginning in July of 1963 and continuing into 1964 Clay issued to himself a series of checks drawn on Mt. Holly's account. Except for one minor item he claims that they were in payment of services rendered by him. In July of 1963 he received from Louisville Title Insurance Company a check for $3,100 drawn out of the escrow account set up with the loan proceeds and made payable to him for "Legal and organization fee." None of these payments, according to Mt. Holly, was authorized by the corporation, and apparently it is true that there never was an official meeting of the directors or any formal corporate action evincing such authority. Mt. Holly relies on the familiar principle that in such matters a corporation may speak only through its formal records. See the discussion of this subject in Star Mills v. Bailey, 140 Ky. 194, 130 S.W. 1077 (1910), in which it is pointed out that "unofficial, casual meetings" of the men who comprise the board of directors do not constitute binding actions of the corporation. 130 S.W. at p. 1079.

Clay, on the other hand, says in effect that he had discussed these matters in a general way with Carrier and Wilson and that they had acquiesced. He takes the position also that by-laws may be created by custom or usage, and that his authority to draw from the corporation in payment for his services was established in that manner. Cf. Kozy Theater Co. v. Love, 191 Ky. 595, 231 S.W. 249, 253 (1921). His testimony in these respects was as follows:

Q. "By whose authority did you receive this?"

A. "By whose authority?"

Q. "Yes."

A. "By the authority I suppose of the Board of Directors, by the authority given to me as executive Vice presi-

dent, secretary and treasurer, and chairman of the executive committee, and general manager."

Q. "Was there any resolution of the Board of Directors?"

A. "Nope."

Q. (continuing) "authorizing you to receive any funds at all?"

A. "No, resolution, no."

Q. "Was there any discussion with any members of the board collectively, as such, authorizing you to receive these monies?"

A. "Yes."

Q. "With whom, Carrier?"

A. "With Earl Wilson."

Q. "And, Wilson—"

A. (interrupting) "and, I believe with Carrier on one or two occasions."

From the aspect of summary judgment, it is clear from Clay's deposition as a whole that the foregoing statement is about as close as he is going to come toward proving that Carrier and Wilson were aware of and agreed to his course of conduct in drawing payment for his own services, and we do not feel that it would be enough to sustain his case on the theory of custom and usage. Certainly it does not connote the existence of an unwritten understanding to the effect that for his continuing services to the company Clay could pay himself whenever and whatever he considered to be right. Moreover, the dealings of a corporation with one of its own officers are not quite the same breed of animal as are its dealings with a third party. Here is the very officer whose function it was to keep the documentary house in order. "Hence, if it is ever to be again asserted that a corporation should * * * speak by its record, this is the case in which to say it." Star Mills v. Bailey, 140 Ky. 194, 130 S.W. 1077, 1079 (1910).

To pinpoint our view of the matter, to assume from Carrier's and Wilson's knowledge of and acquiescence in Clay's handling the business and paying the bills that they also knew and approved of the payments to himself is too broad a jump from fact to conclusion without further evidentiary support. And if that support is lacking in the testimony of Clay himself, who of all people should be able to say categorically and specifically what and how Carrier and Wilson knew, the trial court was justified in deducing that a trial would not produce it either. There being nothing further, summary judgment would have been proper. But as we have said, there was a counterclaim.

Just as there is nothing of record giving Clay the authority to act as his own paymaster, neither is there any such evidence, thus far, that he had agreed to work for nothing, or, as Mt. Holly would have it, that his services were to be rendered in payment for his 15% stock interest. The blade cuts both ways. Without such an agreement the simple, honest principles of restitution entitle him to fair compensation. Mt. Holly's argument that a corporate officer is not entitled to pay for "directorial services" unless it has been so provided misses the point that the work done by Clay was far above and beyond the call of his duties as a director. This phase of the case is not resolvable by summary judgment. It requires a trial on the merits.

Upon remand of the proceeding the partial judgment for $7,807.59 in favor of Mt. Holly may remain interlocutory in order that it can be reopened if so warranted by evidence developed in connection with the counterclaim. The status of Clay's breach of contract claim, which he has not pressed on this appeal, may also abide the course of events.

The judgment is reversed for further proceedings consistent with this opinion.

All concur.