**A. E. SMITH, Plaintiff,**

v.

**C. E. MANAUSA et al., Defendants.**

**Civ. No. 1639.**

United States District Court,
E. D. Kentucky,
Covington Division.

Nov. 22, 1974.

Stites, McElwain & Fowler, Frankfort, Ky., James G. Apple, Louisville, Ky., for plaintiff.

Robert F. Barrett, Florence, Ky., for Manausa.

Truett R. DeMoisey, pro se.

Harry L. Riggs, Jr., Erlanger, Ky., for all other defendants.

## MEMORANDUM

SWINFORD, District Judge.

This action seeks recovery of amounts expended and profits lost as a result of the defendants' alleged noncompliance with federal and state securities and corporate legislation. Securities Act of 1933, 15 U.S.C. § 77a, et seq.; Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq; KRS Chapters 271 and 292. Trial was held on May 6–9, 1974, and the parties accorded an opportunity for the submission of briefs. The record is now before the court for decision.

Although presenting complex questions of law, the facts of the case are uncomplicated and largely uncontested. Frontier Enterprises, Inc., was organized in 1969 by the eight defendants and two nonparties to operate a chain of restaurants, motels, and food marts. In January, 1970, the plaintiff purchased leasehold interests in three "fast food" restaurants in Columbus, Ohio, operated by the failing Kettle Fried Chicken of America. The transactions giving rise to this action occurred in March, 1970, with negotiations addressing the sale of Frontier stock and the plaintiff's three Ohio restaurants. Smith had transacted business with Frontier in the past and his interest in consummating an agreement was heightened by a "balance sheet" purporting to represent the assets and liabilities of the offering corporation. Although unsigned, the evidence indicated that the sheet was discussed by the directors and furnished by the Frontier president on behalf of the corporation. Plaintiff's Exhibit 61. Relying on the balance sheet, Smith purchased 10,000 shares of stock outright and agreed to exchange all of his Ultra stock for 160,000 Frontier shares and $120,000 in corporate notes payable first upon the passage of nine months or completion of a public stock issue. See Plaintiff's Exhibit 10. The understanding was embodied in an April 26, 1970, contract signed by the president and approved by Frontier's board of directors. Plaintiff's Exhibits 11, 62. Although a certificate for 10,000 shares was furnished, Plaintiff's Exhibit 9, Smith did not receive the remaining stock or promissory notes; indeed, the evidence indicated that in April, 1970, Frontier had already dispensed stock far exceeding that authorized in its Articles of Incorporation. See Plaintiff's Exhibit 17.

Frontier took possession of the three restaurants, but defaulted on lease payments in the fall of 1970. A public stock offering was precluded by the inability to secure registration and the corporate obligations to the plaintiff were never satisfied. It is contended that the balance sheets contained misrepresentations

prohibited by the disclosure provisions of federal and state statutes, Sections 12 and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*, 77q; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), KRS 292.480; KRS 292.320; and that the stock was not registered as required by Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and KRS 292.340. The defendants' personal liability is predicated upon (1) the "controlling person" and/or "aiders and abettor" responsibility engrafted in the securities regulation, 15 U.S.C. §§ 77*o*, 78t; KRS 292.480(2); (2) noncompliance with the statutory prerequisites to doing corporate business specified in KRS 271.095. Damages sought include $29,532.54 paid out by the plaintiff on behalf of Frontier in an effort to prevent cessation of the Ohio operations, $200,000.00 in lost profits from the three restaurants occasioned by the abandonment of the leases, attorneys' fees, and interest.

## I

The defendants peripherally argue that the court lacks subject matter jurisdiction over the state law elements because the claims involve dissimilar *causes of action.* Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Although not expanding federal jurisdiction, the philosophy embodied in the Federal Rules of Civil Procedure has diminished the importance of the *"cause of action"* criterion applied in Hurn. Mine Workers v. Gibbs, 383 U.S. 715, 724–725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In Lewis v. Pennington, 6th Cir., 400 F.2d 806, 816 (1968), cert. denied 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed. 2d 444 (1968), the Court outlined the requirements for the exercise of pendent jurisdiction:

"(1) that the federal claim have 'substance' so as to confer jurisdiction of

the subject matter on the court in which the action is commenced and (2) that the 'state and federal claims must derive from a common nucleus of operative fact'."

Accord, Kayser-Roth Corp. v. Textile Workers Union of America, 6th Cir., 479 F.2d 524 (1973), cert. denied 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). The "power" to exercise pendent jurisdiction must be coupled with a discretionary finding that "judicial economy, convenience and fairness to litigants . . ." dictate its implementation. Mine Workers v. Gibbs, supra, 383 U.S. at 726, 86 S.Ct. at 1139; Johnson v. Miller, E.D.Ky., 367 F.Supp. 541, 543 (1973). There is little doubt of either the substantiality of the federal question or the factual identity of the respective claims; the propriety of a single resolution is reflected in the decisions joining allegations of common law fraud and state securities acts violations with claims under corresponding federal legislation. See Vanderboom v. Sexton, 8th Cir., 422 F.2d 1233, 1241–1242 (1970), cert. denied 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); Strahan v. Pedroni, 5th Cir., 387 F.2d 730 (1967).

## II

The initial predicate of liability is found in the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and the Kentucky Securities Act, KRS Chapter 292.[1] The Acts generally employ comparable language to proscribe fraudulent securities transactions. Thus, Section 17(a) of the Securities Act of 1933 sanctions the employment of manipulative devices in the interstate offer or sale of any security:

"It shall be unlawful for any person in the offer or sale of any securities by the use of *any means or instruments* of transportation or communica-

---

[1]. A civil remedy is expressly provided in the 1933 legislation, 15 U.S.C. §§ 77*l*, 77*o*, KRS 292.480, and the courts have been prompt to imply such authorization in the Securities Exchange Act of 1934. See Annot., 37 A.L. R.2d 649, Section 2.

tion in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

15 U.S.C. § 77q(a).

Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), outlaws in similar language the conduct proscribed in Section 17(a), of the Securities Act of 1933, 15 U.S.C. § 77q(a), but extends the proscription to the purchase as well as the sale of securities. 17 C.F.R. 240.-10b–5. The Kentucky "Blue Sky" legislation essentially parallels the federal acts. KRS 292.480(1) prohibits the offer or sale of a security through a knowingly untrue statement or omission of a material fact, while KRS 292.320(1) duplicates Rule 10b–5.

The alleged nondisclosure violations generally relate to the representations of the balance sheet furnished the plaintiff by the corporation. Examination of the document reveals several irregularities tending to inflate the corporation's recited worth. Although formally valid, the obligors on the claimed $170,000.00 in notes receivable were corporations controlled by the Frontier directors; further, the notes were given not for cash or property but apparently for future restaurant franchises. Plaintiff's Exhibits 27–31. The plaintiff maintains that the loans were uncollectible for lack of consideration and that the failure to disclose the interlocking ownership of the debtors and creditor induced an inflated representation of the corporation's worth. Transcript, p. 117–120. Also listed as an asset was certain Northern Kentucky realty valued on the sheet at $207,000.00. Aside from the diminished equitable ownership attributable to pending mortgages the evidence indicated that Frontier at no time possessed legal title over the property: the stock recited as the sale price for the land was never transferred and the vendor, Eight, Inc., did not itself own one of the parcels "purchased" by Frontier. The above misrepresentations were coupled with the corporation's failure to disclose sales in excess of the shares authorized in the Articles of Incorporation.

While the inaccuracies and nondisclosures of the balance sheet ostensibly fall squarely within the legislative prohibitions, the transaction must be examined to determine whether the plaintiff was a statutory "purchaser" or "seller" of a "security" in response to a statement containing a "material" fact or omission. There is little doubt that the contract was a "security" as defined by the Acts.[2] The term "security" is defined as "any note, stock, . . . evidence of indebtedness, . . . investment contract . . . or, in general, any interest or instrument commonly known as a 'security' . . . ." 15 U.S.C. § 77b(1). The defendants' promise to deliver shares of stock at a stated time clearly reveals a "note" or "evidence of indebtedness" under the 1933 Act. See Lawrence v. Securities and Exchange Commission, 1st Cir., 398 F.2d 276, 279 (1968); Llanos v. United States, 9th Cir., 206 F.2d 852, 854 (1953), cert. denied 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954). Further, the liberal construction mandated in applying this legislation, Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), would apparently qualify the

2. The federal acts are complementary and must be interpreted as a cohesive package. Rosenberg v. Globe Aircraft Corp., E.D.Pa., 80 F.Supp. 123 (1948); although a dearth of authority applies the state legislation, the employment of identical language suggests the applicability of the federal interpretations.

transaction as an "investment contract." Although cast as a nebulous concept to facilitate inclusion of a broad range of commercial practices, an investment contract generally connotes "an investment of money in a common enterprise with profits to come solely from the efforts of others." S. E. C. v. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967). While the anticipated profits in the transaction at bar would not be generated "solely" by the defendants, more recent judicial applications have adopted a flexible application of the passivity requirement. Thus, the Ninth Circuit Court of Appeals has ruled that the status of a "self-improvement" program as an investment contract is not modified by the participants' marginal involvement:

"Strict interpretation of the requirement that profits to be earned must come 'solely' from the efforts of others has been subject to criticism. . . . Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. . . . (W)e adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc., 9th Cir., 474 F.2d 476, 482 (1973), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

Compare Lino v. City Investing Co., 3d Cir., 487 F.2d 689, 692–693 (1973); Nash & Associates, Inc. v. Lum's of Ohio, Inc., 6th Cir., 484 F.2d 392 (1973). The coordinate responsibility exercised by the plaintiff does not dilute the character of the arrangement as an "investment contract" within the contemplation of Sections 12 and 17 of the Securities Act of 1933, Section 10(b) of the Securities Act of 1934, and the Kentucky "Blue Sky" Act.

The substantive definition of "security" is shared by the 1933 and 1934 legislation, Tcherepnin v. Knight, supra; Wasnowic v. Chicago Board of Trade, M.D.Pa., 352 F.Supp. 1066, 1070 (1972), aff'd 3d Cir., 491 F.2d 752 (1973); however, the Securities Exchange Act incorporates an exclusion omitted in the earlier legislation:

"The term 'security' . . . shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months . . ." 15 U.S.C. § 78c (a)(10).

Although maturing within the statutory period, the obligation involved in the case at bar is not within the contemplation of the above exclusion. The court in Sanders v. John Nuveen & Co., Inc., 7th Cir., 463 F.2d 1075, 1079 (1972), cert. denied 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), ruled that the applicability of the statutory exclusion was governed by the standard exempting short-term paper from registration:

" 'The legislative history of the Act makes clear that Section 3(a)(3) applies only to (1) prime quality negotiable commercial paper (2) of a type not ordinarily purchased by the general public, that is (3) paper issued to facilitate well recognized types of current operational business requirements and (4) of a type eligible for discounting by Federal Reserve Banks'." Quoting SEC Release No. 33–4412, 17 C.F.R. 231.4412.

Anderson v. Francis I. duPont & Co., D. Minn., 291 F.Supp. 705, 708–709 (1968). The asserted arrangement leaves little doubt that the scheme was a "security" as defined by applicable legislation.

The assailed transaction also involved the "purchase" and "sale" of securities through the mails or in interstate commerce:

"The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell',

'offer for sale', or 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3).

15 U.S.C. §§ 78c(a)(13) and 78c(a)(14). The liberal construction of this term [3] embraces the giving of promissory notes,[4] commitments to deliver stock in the future,[5] and exchanges of property,[6] as well as well as the bare issuance of stock.[7]

The numerous negotiations and mailings clearly established the requisite interstate activity. 15 U.S.C. § 77b(7); 15 U.S.C. § 78c(a)(17). Such involvement need not represent the fraudulent conduct itself, Stevens v. Vowell, 10th Cir., 343 F.2d 374, 378–379 (1965), but may occur at any time from the commencement of negotiations to delivery of the security. Dupler v. Simmons, D.Wyo., 163 F.Supp. 535, 540 (1958). Indeed, the Court in Myzel v. Fields, 8th Cir., 386 F.2d 718, 727–728 (1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), held that the mere intrastate use of the telephone system confers the interstate nexus.[8]

The *governing legislation* prohibits not mere inaccuracies but only "material" misrepresentations or omissions.

"The term 'material', when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered." 17 C.F.R. 230.405 (1).

Thus the reasonable investor has been protected from property and stock overvaluations [9], false assurances of proper registration [10], expansive portrayals of novel processes and business conditions [11], and nondisclosed information regarding the intimacy between parent and subsidiary corporations [12]. The balance sheet furnished the plaintiff similarly fell short of acceptable standards of candor: (1) the formal validity of the promissory notes concealed the debtors' status as commonly owned entities; (2) although Frontier perhaps exercised "equitable ownership" over listed realty, the balance sheet did not reveal that legal title had not been transferred; (3) the profile seriously inflated the true worth of the company. The representations are not legitimized by the absence of overt misstatements; the antifraud legislation proscribes "half-truths" whose literal accuracy belies the clarification necessary for an informed judgment. Kubik v. Goldfield, supra.

The court is not persuaded that the plaintiff was or should have been aware of the true financial condition of Frontier. While the sophistication of the

3. United States v. Monjar, D.Del., 47 F.Supp. 421, 426 (1942), aff'd 3d Cir., 147 F.2d 916 (1944), cert. denied 325 U.S. 859, 65 S.Ct. 1191, 89 L.Ed. 1979 (1944).

4. Llanos v. United States, supra, 206 F.2d at 854.

5. Lawrence v. Securities and Exchange Commission, supra.

6. Swanson v. American Consumer Industries, Inc., 7th Cir., 415 F.2d 1326, 1330 (1969).

7. Rekant v. Desser, 5th Cir., 425 F.2d 872 (1970).

8. Accord, Ingraffia v. Belle Meade Hospital, Inc., E.D.La., 319 F.Supp. 537 (1970); Nemitz v. Cunny, N.D.Ill., 221 F.Supp. 571, 573 (1963); contra Burke v. Triple A Machine Shop, Inc., 9th Cir., 438 F.2d 978 (1971);

Rosen v. Albern Color Research, Inc., E.D. Pa., 218 F.Supp. 473, 476 (1963).

9. Johns Hopkins University v. Hutton, 4th Cir., 422 F.2d 1124, 1128–1129 (1970), cert. denied 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974); Emmi v. First-Manufacturers Nat. Bk. of Lewiston & Auburn, D.Me., 336 F.Supp. 629 (1971).

10. Kubik v. Goldfield, 3d Cir., 479 F.2d 472 (1973).

11. Hill York Corp. v. American Internat'l Franchises, Inc., 5th Cir., 448 F.2d 680, 685 (1971); Gilbert v. Nixon, 10th Cir., 429 F.2d 348 (1970).

12. United States v. Hill, D.Conn., 298 F.Supp. 1221, 1232 (1969).

investor may imply such knowledge[13], the evidence does not suggest that Smith was cognizant of the misrepresentations and omissions contained in the balance sheet; rather, it is apparent that the plaintiff relied on the representation of the balance sheet in deciding to transact business with Frontier.[14]

## III

The Securities Acts penalize controlling officials as well as the actors most intimately connected with injurious conduct:

> "Every person who, by or through stock ownership, agency or otherwise, or who . . . controls any person liable under . . . this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

15 U.S.C. § 78t. The "controlling person" concept includes the depositories of corporate power regardless of the official position or ostensible unimportance of the actor involved. Johns Hopkins University v. Hutton, supra 422 F.2d at 1130; Anderson v. Francis I. duPont & Co., supra, 291 F.Supp. at 709–710. The defendants in the case at bar uncontestably wielded exclusive authority over the affairs of the enterprise. Dyer v. Eastern Trust and Banking Company, D.Me., 336 F.Supp. 890, 915 (1971).

A more difficult question involves the standard of care to which the directors are held. The plaintiff contends that mere negligence or mistake in sponsoring the issuance of statements is actionable, while the defendants argue that a more profound culpability must be demonstrated. Smith relies upon the holding in Texas Continental Life Ins. Co. v. Bankers Bond Co., W.D.Ky., 187 F.Supp. 14, 23 (1960), reversed on other grounds 6th Cir., 307 F.2d 242 (1962), that liability exists independently of the defendants' "integrity":

> "(I)t was the intention of the Congress . . . to give the purchaser . . . a right to recover without the necessity of offering proof of deceit and intentional fraud. The statute contemplates a new right of action for the good-faith purchaser to recover from the seller for constructive fraud which grows out of the failure to make a full and complete disclosure.
>
> Not only is the corporation which holds title to the securities at the time of sale, but also its officers, authorizing the sale of such stocks, are legally responsible to purchasers in good faith, even though the act for the corporation is done through mistake and without fraudulent intent. . .
>
> A plaintiff purchaser need only prove that a statement in a prospectus or oral communication is in fact false or is a misleading omission and that he did not know of such untruth or omission."

Parrent v. Midwest Rug Mills, Inc., 7th Cir., 455 F.2d 123, 126 (1972); Vanderboom v. Sexton, supra, 422 F.2d at 1238; Ellis v. Carter, 9th Cir., 291 F.2d 270, 274 (1961). Several decisions appear to have conditioned the requisite

---

13. Compare Clement A. Evans & Co. v. McAlpine, 5th Cir., 434 F.2d 100, 104 (1970), cert. denied 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), with Hill York Corp. v. American Internat'l Franchises, Inc., supra 448 F.2d at 690; John R. Lewis Inc. v. Newman, 5th Cir., 446 F.2d 800, 806 (1971).

14. Compare Gottlieb v. Sandia American Corporation, 3d Cir., 452 F.2d 510, 515 (1971), cert. denied 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971); John R. Lewis Inc. v. Newman, supra 446 F.2d at 804; City National Bank of Fort Smith, Ark. v. Vanderboom, 8th Cir., 422 F.2d 221, 230–231 (1970); Chelsea Associates v. Rapanos, E.D. Mich., 376 F.Supp. 929 (1974), with Gilbert v. Nixon, supra 429 F.2d at 356; Johns Hopkins University v. Hutton, supra 422 F.2d at 1129.

degree of scienter upon the statute involved, Fischman v. Raytheon Mfg. Co., 2d Cir., 188 F.2d 783 (1951); Emmi v. First-Manufacturers Nat. Bk. of Lewiston & Auburn, supra; Gould v. Tricon, Inc., S.D.N.Y., 272 F.Supp. 385, 393 (1967), while the Second Circuit has rejected the negligence standard and broadened the sphere of excusable ignorance:

"We uniformly have held that a party cannot be held liable in a private suit for damages under Rule 10b–5 for mere negligent conduct. . . . The standard for determining liability . . . essentially is whether plaintiff has established that defendant either knew the material facts that were misstated or omitted and should have realized their significance, or failed or refused to ascertain and disclose such facts when they were readily available to him and he had reasonable grounds to believe that they existed. . . . It is not enough for plaintiff to show that defendant failed to detect certain material facts when he had no reason to suspect their existence." Cohen v. Franchard Corporation, 2d Cir., 478 F.2d 115, 123 (1973), cert. denied 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973).

Republic Technology Fund, Inc. v. Lionel Corporation, 2d Cir., 483 F.2d 540, 551 (1973), cert. denied 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974). It is unnecessary to assess the relative efficacy of the above views since the evidence revealed a violation even under the more lenient standard. The defendants admittedly did not personally draft the balance sheet or scheme to defraud the plaintiff; however, there is little doubt that the directors were or should have been cognizant of the excessive stock sales; the defendants' positions as owners and controllers of Frontier and related enterprises peculiarly vested them with knowledge of the ineffectual property transfers and intercorporate notes. Despite this awareness, the board proffered no objection when the document was employed as a sales inducement.

IV

■ The plaintiff additionally claims that the subject transaction violated Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and KRS 292.340, prohibiting the offer or sale of unregistered securities. Although many shares of Frontier stock were sold in intra- and interstate commerce, it is undisputed that the stock was never registered with the state or federal governments. The defendants do not assert the many technical exclusions from the registration requirements, 15 U.S.C. §§ 77c, 77d; KRS 292.400, 292.410, 292.480, but argue only that they relied on advice of counsel and negotiations with the Kentucky Department of Securities evincing satisfactory progress toward registration. Although efforts to secure compliance with legislative requirements may portray the actor's intent, the court is cited to no provision or decision staying the effect of the registration requirements during attempts to comply with the statutory demands. Whatever the validity of the advice of counsel defense, see Tarvestad v. United States, 8th Cir., 418 F.2d 1043, 1047 (1969), cert. denied 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970); United States v. Custer Channel Wing Corporation, 4th Cir., 376 F.2d 675, 683 (1967), cert. denied 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967), the evidence reveals that DeMoisey's earlier improprieties had resulted in a decrease in the board's reliance on his advice. See Deposition of Grover C. Mills, p. 73.

V

■ It is also asserted that the April 26, 1970, agreement was consummated prior to the date upon which Frontier was competent to transact business under KRS 271.095:

"(1) A corporation formed under this chapter shall not incur any debts or begin the transaction of any busi-

ness except such as is incidental to its organization or to the obtaining of subscriptions to or the payment for its shares, until:

\* \* \* \* \* \*

(c) The first board of directors has been elected *by the shareholders* . . . .

\* \* \* \* \* \*

(2) If a corporation has transacted any business in violation of this section, the officers who participated therein and the directors, except those who dissented therefrom and caused their dissent to be filed at the time in the registered office of the corporation, or who, being absent, so filed their dissent upon learning of the action, shall be severally liable for the debts or liabilities of the corporation arising therefrom." [15] (Emphasis supplied).

Although Articles of Incorporation issued by the Secretary of State on June 13, 1969, were properly filed in the county clerk's office, Plaintiff's Exhibit 18, the board of directors was not elected by the shareholders but by the directors themselves on June 2, 1969. Plaintiff's Exhibit 61. Contrary to the defendants' assertions, there is no intimation that the June 2 session was a shareholders' meeting; although the minutes of that meeting recite that directors were elected, the corporate records and testimony reveal no shareholders meeting before that date. Plaintiff's Exhibit 61; Deposition of Dr. Howard Ravenscraft, p. 19. KRS 271.-395; Bastin v. Givens, Adm'x, 170 Ky. 201, 205, 185 S.W. 835 (1916); Clay v. Mt. Holly Development Co., Ky., 464 S. W.2d 621, 624 (1971).

The contention that the transaction with the plaintiff was one incidental to the organization of the corporation is rebutted by the evidence that on April 26, 1970, Frontier had been in operation for several months with a substantial number of shares already sold; the corporation was represented to the plaintiff as a viable and active entity rather than a fledging enterprise. The defense conferred upon those who dissent from premature corporate action, KRS 271.-095(2), is similarly unavailable to the defendants. Although three of the directors were not present at the meeting at which the transaction with Smith was approved, Plaintiff's Exhibit 61, the corporation records reveal no absolving dissent on the part of those absent.

The irregularities invoking liability under KRS 271.095 were admittedly trivial and undoubtedly caused only minimal effect upon the internal operations or marketplace activities of the corporation; however, the precise legal form of the entity known as Frontier is irrelevant where, as here, an explicit statutory prohibition has been violated.

"(W)e are not concerned with the question of whether the corporation had a *de facto* or *de jure* existence . . . .. The personal liability . . does not rest on traditional common law principles, but on the express statutory provision of KRS 271.095 (2).

\* \* \* \* \* \*

Those who purport to act for a corporation before its governing body is legally constituted must be held its de facto officers for the simple reason that otherwise they could act indefinitely with complete impunity, without ever meeting the requirements of KRS 271.095." Tri-State Developers, Inc. v. Moore, Ky., 343 S.W.2d 812, 815–816 (1961).

## VI

The complaint seeks $29,532.54, representing amounts paid by the plain-

---

15. Although repealed in 1972, the enactment of the Kentucky Business Corporation Act did not diminish "any right accrued or established, or any liability or penalty incurred, under the provisions of such act, prior to the repeal thereof." KRS 271A.680. At any rate, the amended statute similarly imposes joint and several liability upon those "who assume to act as a corporation without authority to do so . . . .." KRS 271A.670.

tiff on behalf of Frontier, $200,000.00 for loss of restaurant profits by reason of the defendants' forfeiture of the leases in Columbus, Ohio, pre-judgment interest, costs of action, and attorneys' fees.

The Securities Acts generally contemplate recovery of "the consideration paid for such security with interest thereon, less the amount of any income received thereon . . . or for damages if he no longer owns the security." 15 U.S.C. § 77*l*. Calculation of the relative values of the security is impeded by the uncertain worth of the leasehold interest exchanged. The plaintiff's non-receipt of the stock and promissory notes suggests the desirability of recovery coextensive with actual pecuniary losses:

> "The measure of damages recoverable in actions involving misrepresentations in sales of investment securities is 'actual damages on account of the act complained of.' Securities Exchange Act of 1934, 15 U.S.C. § 78bb. . . . ' "Actual damages" under the Federal rule of damages for fraud is the "out of pocket rule".' . .

> Application of the out of pocket damages rule arises when a disparity exists between what the purchaser thought he was getting and what, in actuality, he finally received. In determining the amount of damages, it is a well recognized rule that the complaining party is entitled to be made whole. . . . He cannot, however, recover in excess of that to which he was entitled in making him whole." Richardson v. MacArthur, 10th Cir., 451 F.2d 35, 43 (1971).

Wolf v. Frank, 5th Cir., 477 F.2d 467, 478 (1973), cert. denied 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); Johns Hopkins University v. Hutton, D. Md., 326 F.Supp. 250, 262 (1971), reversed on other grounds 4th Cir., 488 F.2d 912 (1973), cert. denied 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974); Schaefer v. First National Bank of Lincolnwood, N.D.Ill., 326 F.Supp.

1186, 1193 (1970), order reversed and appeal dismissed on other grounds, 7th Cir., 465 F.2d 234 (1972); Chaney v. Western States Title Insurance Company, D.Utah, 292 F.Supp. 376 (1968); Stevens v. Abbott, Proctor & Paine, E.D.Va., 288 F.Supp. 836, 849–851 (1968). Smith's "out of pocket" expenses are limited to $29,532.54 paid on behalf of Frontier.

It is also maintained that permissible recovery embraces the profits lost because of the defendants' forfeiture of the restaurant leases. Conceding the federal limitation of damages, the plaintiff argues that the application of Kentucky's "benefit of bargain" rule is implicitly sanctioned by language in the 1933 and 1934 Acts providing that "(t)he rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may arise at law or in equity." 15 U.S.C. § 77p; 15 U.S.C. § 78bb(a). The court disagrees. First, this action was commenced not under common law principles but pursuant to explicit federal and state enabling legislation. Thus, the decision in Dempsey v. Marshall, Ky., 344 S.W.2d 606 (1961), permitting the plaintiff to recover under a "benefit of bargain" philosophy involved a non-statutory action for fraudulent misrepresentation rather than a claim under the Securities Acts. The other cited opinions similarly awarded exemplary damages under common law fraud principles without addressing the interaction of securities regulation and the "benefit of bargain" rule. Young v. Taylor, 10th Cir., 466 F.2d 1329, 1337–1338 (1972); Gann v. Bernzomatic Corporation, S.D.N.Y., 262 F.Supp. 301, 304 (1966). Although the court is cited to no state decision specifically applying the "out of pocket" rule in a securities action, the parallel statutory language suggests that the Kentucky courts would adhere to the federal policy limiting recovery to actual losses.

A pendent application of the "benefit of bargain" rule is further precluded

by the plaintiff's failure to mitigate damages. The 1970 agreement specifically provided that in the event of Frontier's default, the restaurant leases were to be conveyed to the plaintiff without the necessity of court proceedings. While several rental payments were made on behalf of the defendants, Smith took no action when the corporation's inability to satisfy that obligation became apparent.

" 'Where an injured party finds that a wrong has been perpetrated on him, he should use all reasonable means to arrest the loss. He cannot stand idly by and permit the loss to increase, and then hold the wrongdoer liable for the loss which he might have prevented'." Wood Mosaic Co. v. Britt, 150 Ky. 357, 362, 150 S.W. 355, 357 (1912).

Smith v. Ward, Ky., 256 S.W.2d 385, 388 (1953); 22 Am.Jur.2d "Damages" Section 30. The failure to invoke a contractual provision explicitly drafted to preserve the leasehold interest from forfeiture reveals an imprudent and uncompensable business decision. Although initially ignorant of Frontier's financial inadequacies, the plaintiff's later behavior conjures motivations inconsistent with the purpose of securities regulation; "the purpose . . . is to protect the innocent investor, as distinguished from one who loses his innocence and waits to see how his investment turns out before he decides to invoke the act . . . ." Hecht v. Harris, Upham & Co., N.D.Cal., 283 F.Supp. 417, 428 (1968), modified on other grounds 9th Cir., 430 F.2d 1202 (1972).

■ The prayer for attorneys' fees will be denied. The provision for legal expenses in the state statute, KRS 292.-480, and certain unrelated federal securities sections, 15 U.S.C. §§ 77k(e), 78i(e), 78r(a), does not diminish the discretionary nature of this element of recovery. See Grain Dealers Mut. Ins. Co. v. Farmers U. Coop. E. & S. Ass'n, 10th Cir., 377 F.2d 672, 683 (1967); 69 Am.Jur.2d "Securities Regulation—Federal", Section 547. The complaint does not seek the preservation of a fund benefitting other investors, Mills v. Electric Auto-Lite, 396 U.S. 375, 392–397, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Kahan v. Rosenstiel, 3d Cir., 424 F.2d 161, 174 (1970), cert. denied 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), or present any "overriding considerations of justice" normally reflected in an award of attorneys' fees. Fey v. Walston & Co., Inc., 7th Cir., 493 F.2d 1036, 1056 (1974); Walker v. Columbia Broadcasting System, Inc., 7th Cir., 443 F.2d 33 (1971).

■ The case at bar similarly presents none of the factors justifying pre-judgment interest. Although permitted in securities actions in the discretion of the court, Wolf v. Frank, 5th Cir., 477 F.2d 467, 479 (1973), cert. denied 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), the measure of damages employed herein indicates that the exaction of such a sum would be inequitable. Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

A judgment will be entered granting the plaintiff damages in the amount of $29,532.54, costs of action and post-judgment interest.